Genowefa ZARANSKA, Petitioner,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Tom Ridge as Secretary of United States Department of Homeland Security, United States Citizenship and Immigration Services, and Mary Ann Gantner as District Director, New York District, United States Citizenship and Immigration Services, Respondents.

No. MISC–04–0169 (FB)(JMA).

United States District Court, E.D. New York.

Nov. 10, 2005.

Przemyslaw Jan Bloch, Esq., Brooklyn, NY, for Petitioner.

Roslynn R. Mauskopf, United States Attorney, Eastern District of New York by Scott Dunn, Assistant United States Attorney, Brooklyn, NY, for Respondents.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

On June 8, 2004, Petitioner Genowefa Zaranksa ("Zaranska") filed a petition with the Court pursuant to 8 U.S.C. § 1447(b), requesting that the Court adjudicate her application for naturalization or remand the application to the United States Citizenship and Immigration Services (the "CIS") for adjudication. While the petition was *sub judice*, the CIS denied Zaranska's application for naturalization. The United States Department of Homeland Security ("DHS"), Michael Chertoff[1] as Secretary of the Department of Homeland Security, the CIS, and Mary Ann Gantner as District Director of the CIS (collectively, "respondents"), moved to dismiss Zaranska's petition pursuant to Fed.R.Civ.P. 12(b)(1) on the grounds that (1) it became moot following CIS's denial of her application, and (2) Zaranska has not exhausted her administrative remedies under 8 U.S.C. § 1421(c), which sets forth the process by which an applicant may appeal the CIS's denial of a naturalization applica-

---

1. When this petition was filed, Tom Ridge, then Secretary of the Department of Homeland Security was named as a respondent. Mr. Chertoff, who has since replaced Mr. Ridge, is substituted as a party respondent in this case pursuant to Fed.R.Civ.P. 25(d)(1).

tion.[2] Respondents moved in the alternative for summary judgment denying Zaranska's application on the grounds that her prior conviction for assaulting a police officer was a crime of moral turpitude which prevents the requisite finding under 8 U.S.C. § 1427(a) and 8 C.F.R. § 316.10 that she is a person of "good moral character."

The Court referred the matter to Magistrate Judge Azrack for a Report and Recommendation ("R & R") in accordance with 28 U.S.C. § 636(b). On July 18, 2005, Magistrate Judge Azrack issued the R & R, familiarity with which is assumed, concluding that the federal courts have exclusive jurisdiction over naturalization applications pursuant to 8 U.S.C. § 1447(b); therefore, the motion to dismiss should be denied and the matter adjudicated by the Court. Magistrate Judge Azrack further recommended that respondents' motion for summary judgment be denied on the grounds that Zaranska's prior conviction did not involve a crime of moral turpitude and that Zaranska was therefore not ineligible for naturalization on that basis. Respondents filed timely objections to the R & R; therefore, the Court will review *de novo* those portions of the R & R as to which objections were made. *See* 28 U.S.C. § 636(b)(1); *United States v. Tortora*, 30 F.3d 334 (2d Cir.1994). For the reasons set forth below, the Court adopts the R & R.

## I.

### A. Respondents' Motion to Dismiss

■ As Magistrate Judge Azrack noted, 8 U.S.C. § 1447(b) provides that if the CIS fails to make a determination on a naturalization application within 120 days following an examination of that applicant under 8 U.S.C. § 1446,

> the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

8 U.S.C. § 1447(b). The question of whether district courts have exclusive jurisdiction over a petition filed in district court under § 1447 after expiration of the 120–day period, thereby depriving the CIS of jurisdiction to decide the naturalization application while the petition is pending in the district court, has not been addressed by the Second Circuit. Judge Azrack's determination that a petition filed with a district court under § 1447 strips the CIS of jurisdiction to act upon the petitioner's naturalization application relies primarily on a recent unanimous *en banc* decision by the Ninth Circuit, *United States v. Hovsepian*, 359 F.3d 1144 (9th Cir.2004).

Respondents object to Judge Azrack's reliance on the Ninth Circuit's decision, arguing that an unpublished Fourth Circuit decision, an unpublished decision from the Southern District of New York, a published decision from the Northern District of Illinois, and a Second Circuit decision involving the BIA's jurisdiction to reconsider its denial of a claim under the United Nations Convention Against Torture,

---

**2.** 8 U.S.C. § 1421(c) provides:

A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of Title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

provide more persuasive guidance. Respondents assert that the decision in *Hovsepian* is flawed because the court misinterprets the Supreme Court's decision in *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), from which the Ninth Circuit derives the principle that Congress demonstrates an intent to strip an agency of jurisdiction where a statute both requires that the agency act within a particular time period and specifies a consequence for failure to comply with the time limit. Respondents also take issue with the Ninth Circuit's determination that the purpose and legislative history of 8 U.S.C. § 1447 support its construction of the statute. Finally, respondents object that once a naturalization application has been denied, 8 U.S.C. § 1421(c) provides the only mechanism for judicial review.

The Court concludes that the *Hovsepian* decision is well-reasoned, and that Magistrate Judge Azrack's reliance upon it, rather than the cases cited by respondents, was proper. The Ninth Circuit's analysis of the plain language of the statute is persuasive, as is its examination of the statute's purpose and legislative history. The Court also disagrees with respondents' reading of *Brock,* and finds that *Brock's* reasoning supports the Ninth Circuit's decision. In *Brock,* the court found that the statute at issue did not evidence Congress's intent to deprive the agency of jurisdiction because the statute did not specify any consequence for the agency's failure to act within the specified time period, and the court simply declined to interpret Congress's silence to indicate an intent to foreclose the possibility of any action by the agency after expiration of the relevant deadline. The Court agrees with the Ninth Circuit's observation that, in contrast to the statute at issue in *Brock,* § 1447(b) both requires the CIS to act within a certain period of time and speci-

fies a consequence for failure to comply with the deadline (placing jurisdiction over the naturalization application in the district courts), thereby indicating an intent to strip the agency of jurisdiction.

The cases cited by respondents do not provide persuasive authority to the contrary: the Second Circuit's decision in *Khouzam v. Ashcroft,* 361 F.3d 161 (2d Cir.2004) involved an entirely different statutory provision than the one at issue here, and the Court concludes that its reasoning is not controlling. *Langer v. McElroy,* 2002 WL 31789757 (S.D.N.Y. Dec.13, 2002), is also not on point; in *Langer* the court concluded that analysis under § 1447(b) was not proper because the INS had made a decision on the petitioner's application prior to her filing of a complaint in district court. *Id.* at *3. Similarly, *Chavez v. INS,* 844 F.Supp. 1224, 1225 (N.D.Ill.1993), is distinguishable in that the petitioner in *Chavez* had previously successfully sought a remand from the district court under section 1447(b), and after the INS then proceeded to adjudicate and deny the application, the district court held that the proper avenue for review was under 8 U.S.C. § 1421(c), rather than § 1447(b). Finally, the Court does not find the Fourth Circuit's decision in *Kia v. INS,* 175 F.3d 1014, 1999 WL 172818 (4th Cir.1999) (table), to be persuasive. *Kia* was decided prior to *Hovsepian,* relies on a Ninth Circuit decision that was distinguished and overruled in *Hovsepian,* and unlike *Hovsepian,* does not include any detailed analysis of § 1447 or its legislative history. In the only published case located by the Court to address the issue following the Ninth Circuit's decision in *Hovsepian,* the district court of the District of Columbia agreed with the Ninth Circuit's conclusion that filing a petition in district court pursuant to § 1447(b) strips the CIS of jurisdiction to decide the appli-

cation. *See Castracani v. Chertoff,* 377 F.Supp.2d 71, 73–75 (D.D.C.2005).

Finally, respondents' objection that § 1421(c) provides the sole mechanism for review once an application for naturalization has been denied does not affect the Court's conclusion that § 1447 vests the district courts with exclusive jurisdiction. Respondents' assertion may be true where the CIS's denial occurs *prior to* an applicant's filing of a petition in the district court. Because the Court concludes that the filing of a petition in district court pursuant to § 1447 strips the CIS of jurisdiction, a denial issued by the CIS after the petition is filed cannot have any effect, and § 1421(c) therefore becomes irrelevant to the analysis.

### B. Motion for Summary Judgment

■ Magistrate Judge Azrack also concluded that respondents' motion for summary judgment should be denied because the crime of which Zaranska was convicted is not a crime involving moral turpitude; consequently, Zaranksa is not statutorily ineligible for naturalization.[3] Magistrate Judge Azrack further determined that under the rule of lenity set forth in *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 384, 160 L.Ed.2d 271, 282 (2004), any doubt as to whether the New York statute under which Zaranksa was convicted involves moral turpitude should be resolved in favor of the petitioner. Respondents object that Magistrate Judge Azrack erred in failing to defer to the immigration authorities' determination of what constitutes a crime of moral turpitude, and argue that under the BIA's decision in *Matter of Danesh,* 19 I. & N. Dec. 669, 673 (BIA 1988), the offense of which Zaranska was

convicted involves moral turpitude. Respondents further object that because an applicant bears the burden of proving her eligibility for naturalization, Magistrate Judge Azrack erred in applying the rule of lenity to resolve any residual doubts about the nature of the crime of which Zaranksa was convicted.

The Court concludes that Magistrate Judge Azrack properly looked to Second Circuit precedent to determine whether, in the context of the immigration laws, the crime of which Zaranska was convicted was a crime involving moral turpitude. Contrary to respondents' argument that the Court should defer to the BIA's conclusion of whether an offense involves moral turpitude, the Second Circuit made clear in *Michel v. INS* that " '[w]e must uphold the BIA's determination of what conduct constitutes moral turpitude [under the Immigration and Nationality Act ("INA")] if it is reasonable. However, a determination that the elements of a crime constitute moral turpitude for purposes [of the INA] is a question of law, which we review *de novo.*' " 206 F.3d 253, 262 (2d Cir.2000) (citing *Hamdan v. INS,* 98 F.3d 183, 185 (5th Cir.1996)). In *Michel,* the Second Circuit deferred to the BIA's categorical analysis, which determined that the definition of moral turpitude embraced any knowing possession of stolen property, without consideration of the trivial nature of the property the individual applicant was convicted of possessing, because it was reasonable to equate conduct involving knowledge or intent with a " 'vicious motive or a corrupt mind' "; however, the Second Circuit made a *de novo* determination that "all of the violations [of the N.Y. penal law at issue] are, by their nature,

---

**3.** Zaranska was convicted under N.Y. Penal Law § 120.15(3), which provides that a defendant shall be guilty of assault in the second degree if, "with intent to prevent [] a police officer ... from performing a lawful duty ... [the defendant] causes injury to such [] police officer."

morally turpitudinous because knowledge is a requisite element of [the N.Y. law] and corrupt scienter is the touchstone of moral turpitude." *Michel,* 206 F.3d at 263–64. The determination whether the crime at issue fits the BIA's definition of moral turpitude is therefore one that the Court undertakes *de novo,* without deference to the BIA's application of the definition of moral turpitude in the context of other criminal statutes.

Upon a *de novo* review, the Court finds that Judge Azrack's analysis of Second Circuit precedent regarding the issue of whether the crime at issue is morally turpitudinous is thorough and well-reasoned, and the Court agrees with the conclusion that the crime is not one involving moral turpitude for purposes of the INA. The Court further agrees that *Danesh,* the BIA case upon which respondents rely, is distinguishable, and to the extent that case purports to expand the definition of moral turpitude beyond that established by previous and subsequent BIA decisions, and which this Circuit has upheld as reasonable, that expansion is not entitled to deference. *Cf. Michel,* 206 F.3d at 264 (finding a definition of moral turpitude which equated knowledge or intent to perform an inherently bad act with a "vicious motive or corrupt mind" to be reasonable). Finally, because the Court concludes that Magistrate Judge Azrack correctly determined that the crime of which Zaranksa was convicted was not a crime of moral turpitude, the Court need not address whether application of the rule of lenity was proper in this context.

## II.

Based upon its *de novo* review, the Court adopts Magistrate Judge Azrack's R & R, and denies respondents' motions to dismiss and for summary judgment.

**SO ORDERED.**

*Report and Recommendation*

AZRACK, United States Magistrate Judge.

By Order of December 13, 2004, the above-captioned action was referred to me by the Honorable Frederic Block for a report and recommendation on respondent United States Department of Homeland Security's motion to dismiss petitioner Genowefa Zaranska's application for a hearing on her naturalization application. Because I find that the federal courts have exclusive jurisdiction over petitioner's naturalization application, I recommend that the motion to dismiss be denied and that the matter be adjudicated in accordance with 8 U.S.C. § 1447(b). Respondents move in the alternative for summary judgment denying the naturalization application, on the grounds that petitioner is ineligible for naturalization. I recommend that the court deny respondents' motion for summary judgment. This is because I do not find petitioner ineligible for naturalization, as she has never been convicted of a crime involving moral turpitude.

## I. Background

Petitioner is a Polish national seeking naturalization. She filed an application with the then-Immigration and Naturalization Service ("INS"), now Department of Homeland Security Bureau of Citizenship and Immigration Services ("CIS") on February 23, 1998. On April 18, 2000, petitioner appeared for an examination on her naturalization application. The examination was conducted and a decision on her application reserved. Petitioner thereafter attempted to determine the status of her application. By letter and personal visit of counsel in 2004, she requested information on the status of her application. Neither petitioner nor her attorney received any response.

Petitioner therefore applied to the court under 8 U.S.C. § 1447(b) on July 7, 2004, to accept jurisdiction over the naturalization application and to adjudicate it, or to remand the application with instructions to CIS to adjudicate. Petitioner contends that section 1447(b) grants the district court exclusive jurisdiction over her naturalization application; that is, by virtue of her application for a hearing in federal court, jurisdiction has been stripped from CIS, because the agency did not make a decision on her application within 120 days of her examination. By Order of July 21, 2004, Judge Block demanded respondents show cause why petitioner should not be granted citizenship. Respondents attempted to do so in their motion to dismiss the petition, and in the alternative, for summary judgment, alleging i) that when CIS denied petitioner's application for naturalization on August 5, 2004, the application made in federal court became moot; ii) that petitioner has not exhausted administrative remedies for the denial of her application; and iii) that the application for naturalization must be denied because petitioner cannot show that she is a person of good moral character as required by the relevant statutes. Respondents based their conclusion that petitioner cannot demonstrate good moral character on a conviction in her past. The conviction arose from petitioner's guilty plea on November 2, 1994, to Assault in the Second Degree (N.Y. Penal Law § 120.05), in Supreme Court, Kings County, for which she was sentenced on January 6, 1995 to a term of five years probation.

Respondents' motion to dismiss requires me to analyze a federal statute and recommend to the court an interpretation of the statute. Because I find that the statute confers on the court exclusive jurisdiction over petitioner's application, I also make a recommendation on how the court should determine respondents' motion for summary judgment on the naturalization application itself.

## II. Motion to Dismiss

### A. Standard of Review

Respondents dispute the court's jurisdiction. Under Rule 12(b)(1) of the Federal Rules of Civil Procedure,

[a] case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *See* Fed.R.Civ.P. 12(b)(1). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *See Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996).

*Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000).

### B. Statutory Interpretation

This case requires me to analyze § 1447(b) of Title 8. I am aided in this endeavor by a unanimous en banc decision of the United States Court of Appeals for the Ninth Circuit. *See United States v. Hovsepian,* 359 F.3d 1144 (2004) (en banc). The Ninth Circuit in *Hovsepian* conducted a review of the text of § 1447(b), the context of statutory provisions, and the intent of Congress in enacting the statute. The court concluded that the statute grants exclusive jurisdiction in the federal courts in the situation, as here, where CIS did not decide a naturalization application 120 days after the agency examined the applicant, and the applicant thereafter applied to federal court for a hearing. *Hovsepian,*

359 F.3d at 1159–64. I agree with the Ninth Circuit's methods and result.

### 1. Text of § 1447(b)

When interpreting the meaning of a statute, the analysis begins with the statutory language. *In re Edelman*, 295 F.3d 171, 177 (2d Cir.2002). The statute provides:

> If there is a failure to make a determination under section 1446 before the end of the 120–day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

8 U.S.C. § 1447(b). Read alone, this statute wrests jurisdiction from a delinquent federal agency and places it instead with the federal courts. After the applicant for naturalization applies to the district court for a hearing, "[s]uch court has jurisdiction over the matter" and may do one of two things: i) "determine the matter"; or ii) "remand the matter, with appropriate instructions, to the Service to determine the matter." *See Hovsepian*, 359 F.3d at 1160 ("This wording shows that Congress intended to vest power to decide languishing naturalization applications in the district court *alone, unless* the court chooses to 'remand the matter' to the INS, with *the court's* instructions") (emphasis in original).

Respondents denied petitioner's application after she had applied for a hearing in federal court. It appears, then, that respondents interpret the statute to mean that the agency can determine the matter, even after an applicant for naturalization has applied for a hearing in federal court. The language of the statute, however, does not support this result. Respondents take care in their papers not to explicitly argue that CIS and the courts share jurisdiction over an application once an applicant has applied for a hearing. Respondents choose instead to argue that an entirely different statutory provision governs. But to accept the results of their reading of the statute would mean just what I have said above, that the federal courts share jurisdiction with CIS even after an applicant has applied to the court for a hearing and after the court has jurisdiction over the application. The process described in the statute would be routinely disrupted, however, if CIS could deny the application for naturalization after an applicant has applied for a hearing. The statute would make no sense if the court can determine the application or remand it to the agency with instructions to determine it, if all along the agency could make the determination itself and its determination would "moot" the district court's adjudication. *See Hovsepian*, 359 F.3d at 1160 ("Congress empowered the district court to remand the matter to the INS with the court's instructions. The INS's proposed scheme would, in essence, reverse the hierarchy by allowing the INS to dictate, or at least severely limit, the conditions of remand."). There would be no need for the statute to offer the court the option of remanding the matter to the agency if the agency was able to act on the application all along. Thus, the plain language of the statute establishes that when an application is made to the federal court for a hearing on a stalled naturalization application, the court has jurisdiction over the application. CIS accordingly loses jurisdiction, unless and until the matter is remanded back to it, perhaps with instructions from the court.

Respondents cite *Langer v. McElroy*, No. 00 Civ. 2741, 2002 WL 31789757, 2002 U.S. Dist. LEXIS 23847 (S.D.N.Y. Dec. 16, 2002), for the proposition that the court's jurisdiction is mooted by an agency denial subsequent to the filing of an application with the court. The court in *Langer v. McElroy*, however, found that the process of applying for a hearing was unavailable to the applicant in that case because the agency had rendered its decision denying naturalization long before the applicant went to the court. *See Id.* at *7 (finding that because the INS had approved the application before the applicant applied to the federal court, there was no warrant for § 1447(b) to operate). The decision in *Bahet v. Ashcroft*, No. 01 Civ. 9334, 2002 WL 971712, 2002 U.S. Dist. LEXIS 10196 (S.D.N.Y. Apr. 11, 2002), provides no more support for respondents' proposition. In that case it was the applicant himself who foreclosed federal court review by requesting as relief an order of mandamus to the INS to act. Once the INS had acted, the request for relief was seen by the court as mooted. *See Id.* at *1. Petitioner in this case does not request mandamus; she instead requests just what § 1447(b) says she is entitled to—the court to take jurisdiction of her case. Respondents cite as well to a Fourth Circuit case which found "that the plain language of § 1447 suggests the district court requires an unreviewed application in order to make a determination, and that the INS' denial of naturalization shortly after [the applicant in that case] filed suit mooted the case and deprived the court of jurisdiction." *Kia v. INS*, No. 98–2399, 1999 WL 172818, *1, 1999 U.S.App. LEXIS 5808, at *3 (4th Cir. Mar. 30, 1999). To the extent that *Kia* would dictate a different result from the one I conclude here, I disagree with it and conclude that the "plain" language says the opposite. I note that immediately following the above language in *Kia*, the court cited for support *Sze v. INS*, 153 F.3d 1005 (9th Cir.1998), a case that was specifically distinguished and overruled by *Hovsepian*. *See Hovsepian*, 359 F.3d at 1161 (distinguishing *Sze* on the grounds that the *Sze* plaintiffs brought a test case urging the court to issue a writ of mandamus to the INS to act on stalled naturalization applications, and never asked the court to decide the application itself). Thus, in this situation the plain language of the statute places exclusive jurisdiction in the district court.

### 2. Statutory Context

██ Respondents contend that § 1447(b) is inapplicable because the naturalization application has been denied by CIS, and § 1447(b) involves a failure to make a determination (and the provision is so entitled). They contend that this matter is governed by a different statute, one regarding (naturally) denials of naturalization applications. Under the title "Judicial Review," that statute provides:

> A person whose application for naturalization under this title is denied, after a hearing before an immigration officer under section 1447(a), may seek review of such denial before the United States district court for the district in which such person resides.... Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c).

The words of a statute must be read in their context and in consideration of their place in the overall statutory scheme. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Respondents cite the canon of statutory interpretation which counsels that when two statutes are in

conflict, the one more specific should control over the one more general, especially if the more specific is later in time. *Id.* at 133. Respondents also ask that the provisions be read harmoniously. *See id.* ("A court must [ ] interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole").[1] Statutes should additionally be interpreted such that every clause and word of the statute, if possible, be given effect. *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955). Following the above canons of construction, what emerges is a scheme that allows for de novo review by the federal court of either an agency denial of naturalization or of the agency's failure to act.

Under § 1421(c), if an applicant is denied naturalization, after exhausting her administrative remedies, she may apply to the federal court for a de novo determination of the application. If the applicant so requests, the court must hold a hearing de novo on the application. The court's determination under this provision is not limited at all by what the agency may have determined in its own consideration of the application, given that the court is to arrive at its own findings of fact and conclusions of law after a de novo review. Under this provision, the federal court has the final word on the application for naturalization.

Likewise, under § 1447(b), where CIS has failed to act on an application for naturalization, the applicant may petition the court for a hearing. The court has jurisdiction to determine the matter, or if it prefers, the court can remand the matter back to CIS. To read these provisions together, it makes sense that the court's review is the same in either case; that is, the court has the final word on naturalization applications regardless of whether CIS has made a determination.

These statutory provisions are not in conflict, thus, there is no reason to defer to the more specific one, if that is what § 1421(c) is. To read the statute the way CIS wants me to read it, § 1447(b) would essentially disappear; it would be rendered surplusage. *See Menasche,* 348 U.S. at 539. This is because any time an applicant, frustrated with the agency's failure to act, petitioned the court, the agency could deny the naturalization application and render the application for a hearing moot and § 1447(b) inoperable.

> In the light of § 1421(c), therefore, § 1447(b) is best viewed as a mechanism by which naturalization applicants who are impatient with INS delay may skip the agency's analysis of their application and proceed directly to the step in which the district court conducts a de novo review of the application. In other words … the district court has the final word concerning denial of a naturalization application in one of two ways: either the INS fails to act in a timely manner, in which case the applicant may obtain a hearing and de novo proceeding in district court; or the INS acts unfavorably, in which case the applicant may obtain a hearing and de novo review in district court.

*Hovsepian,* 359 F.3d at 1162–63. If the provisions were part of a harmonious whole, they would not countenance the outcome respondents request here. The agency did not act on petitioner's application. She was therefore forced to apply to

---

1. *Cf. Boatswain v. Ashcroft,* 267 F.Supp.2d 377, 380 (E.D.N.Y.2003) ("Wading through the statutory scheme is not a simple task because, as legal commentators have observed, the immigration laws are a patchwork, containing numerous inconsistencies and vagaries.") (citations and internal quotation marks omitted).

the court to accept jurisdiction and decide the application under § 1447(b). Then, the agency purported to deny the application and inform the court that it had done so. Petitioner, according to CIS, is therefore left to exhaust her administrative appeals. Upon a presumed affirmance of the agency's denial, sometime in the future, she will be back here in federal court, asking for de novo review of the agency's action. The court will then have to rummage through its old files, dust off petitioner's application, and take up the very review it began (or perhaps completed) when the initial application was made.

The court in *Langer v. McElroy* pointed out that "[t]he immigration statutes create two specific points at which a district court may intervene in the naturalization process[,]" and then cited §§ 1447(b) and 1421(c). *See Langer v. McElroy*, 2002 WL 31789757, *2, 2002 U.S. Dist LEXIS 23847 at *6 ("First, if the INS fails to render a decision upon an application within 120 days of the applicants' naturalization examination, the applicant may apply to [federal court for a] de novo hearing on the application, and the court may then determine the matter for itself or remand to the INS with instructions. Second, if the INS denies a naturalization application—and that denial has been confirmed after an administrative appeal ... the disappointed applicant may seek de novo judicial review of the denial in the United States district court for the district in which she resides.") (citations omitted). Considering these statements, and faced with the situation in this case, the court in *Langer* might very well agree with my conclusion. Respondents base all of their arguments on the premise that the applicant's act of applying to federal court for a hearing has no legal significance, but under the language of the statute that is not so. Reading the provisions together supports the conclusion that § 1447(b) controls where a petitioner makes her application for a hearing after 120 days has elapsed after the CIS examination but before CIS acts on the naturalization application.

### 3. Intent of Congress in Enacting § 1447(b)

Where Congress has made its intent clear, the courts must give effect to that intent. *Zadvydas v. Davis*, 533 U.S. 678, 696, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The intent of Congress in enacting the statute, and specifically, § 1447(b), included speeding up the naturalization process, reducing the burdens on the agency and the courts, and ensuring consistency and fairness in naturalization decisions. *See Hovsepian*, 359 F.3d at 1163 (*citing* H.R.Rep. No. 101–187, at 8, 12–13 (1989); 135 Cong. Rec. H4539–02, H4542 (statements of Rep. Morrison and Smith)). A review of the House Judiciary Committee Report supports a determination that Congress intended to streamline and speed up the naturalization system. *See, e.g.*, H.R.Rep. No. 101–187, at 8 (by vesting the authority to confer citizenship in the Attorney General "[t]he legislation streamlines the process towards citizenship"); *id.* at 11 (noting that there was no national uniformity in decision making on naturalization applications) (citation omitted); *see also id.* at 11–12 (recognizing that the difficult cases, such as those involving a contention that an applicant is not of good moral character, "sometimes are placed on the 'backburner' due to agency indecisiveness"). This intent would be consistent with placing jurisdiction with the courts after the agency has forfeited such jurisdiction through inaction. *See id.* at 11 ("Naturalization is an act of great personal consequence to American Immigrants, involving major reorganizations in their sense of identity and offering a new beginning for many. Ac-

cordingly, the Committee emphasizes that the paramount consideration of this legislation and its implementation should be the applicants.") (citation omitted). Under the heading "Judicial Review," the Committee stated:

> The bill provides that decisions to deny citizenship may be appealed to the U.S. District Court and re-evaluated de novo. The Committee strongly believes that although few cases for naturalization have been denied, citizenship is the most valued governmental benefit of this land and applicants should receive full recourse to the Judiciary when the request for that benefit is denied.
>
> In order to conform [the bill] to current practices which allow a "motion to calendar" where there are significant timelags in decisionmaking, the bill provides that the applicant may petition the court after 90 days of the interview on an application if a decision has not been made on the case. Upon petitioning the court, jurisdiction for decisionmaking and conducting the final oath of citizenship lie with the court. It is expected that INS will move expeditiously after full investigation of the facts to calendar cases for examination and decision. Although in some circumstances the need for additional fact finding and processing time would be justified, these complex cases must come to resolution at some point, and if a decision is not rendered in a timely fashion, the Committee believes the petitioner is entitled to a decision and hearing on the case.

H.R.Rep. No. 101–187, at 14. The legislative history, in addition to the plain language of the statute, is evidence of Congress' intent to streamline the naturalization process and create remedies for individuals whose applications have been stalled or denied. My reading of the statute is consistent with the aims of the legislation.

Having determined that the court has jurisdiction to determine the application or remand it with instructions to CIS, I recommend that respondents' motion to dismiss be denied, and I further respectfully recommend a decision on the naturalization application itself.

### III. Motion for Summary Judgment

Respondents argue that if the court refuses to dismiss petitioner's application, the court should still grant summary judgment to respondents because petitioner is ineligible for naturalization. They contend petitioner's ineligibility results from her conviction for a crime involving moral turpitude in the five years prior to her application for naturalization. This is the same ground upon which respondents purported to deny petitioner's application on August 5, 2004. Petitioner's reply in opposition does not address respondents' motion for summary judgment and petitioner does not attempt to establish that she is eligible for naturalization. *See* Petitioner's Reply of June 25, 2005 (entitled "Plaintiff's Answer and Memorandum of Law in Opposition to Defendants' Motion to Dismiss or for Summary Judgment"). The motion for summary judgment should be denied nonetheless, as it is based on a question of law which can be decided by the court without the benefit of a reply from petitioner. Summary judgment should be denied, as I conclude that a second degree assault, in which a police officer is injured when the assaulting party intentionally interferes with the officer's lawful duty, is not a crime involving moral turpitude.

### A. Standard of Review

Summary judgment may not be granted unless the moving party demonstrates that there are no genuine issues of material fact and that the moving party is entitled

to judgment as a matter of law. See Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.

## B. The Naturalization Application

An applicant for naturalization bears the burden "to show eligibility for citizenship in every respect," *INS v. Pangilinan,* 486 U.S. 875, 884, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), and must strictly comply with the requirements for citizenship articulated by Congress. *Fedorenko v. United States,* 449 U.S. 490, 506–07, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). When doubt exists, it must be resolved in favor of the government. *Berenyi v. Dist. Dir.,* 385 U.S. 630, 637–39, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967); *see Boatswain v. Ashcroft,* 267 F.Supp.2d 377, 383 (E.D.N.Y.2003).

An applicant for naturalization has the burden of demonstrating that she was and is a person of good moral character. 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10(a)(1)–(2). Good moral character must be demonstrated for "the five years immediately preceding the date of filing" of a naturalization application. 8 U.S.C. § 1427(a)(3). However,

[n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was ... a member of one or more of the classes of persons, whether inadmissible or not, described in ... subparagraphs (A) and (B) of [8 U.S.C. § 1182(a)(2) ] and subparagraph (C) thereof of such section ... if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period[.]

8 U.S.C. § 1101(f)(3) (2005). Section 1182(a)(2)(A), in turn, provides that "any alien convicted of ... a crime involving moral turpitude (other than a purely political offense) ... is inadmissible." 8 U.S.C. § 1182(a)(2)(A)(i) and (i)(I) (2005). The safeharbor provision of § 1182 provides relief from the section's application to noncitizens

who committed only one crime if ... the maximum penalty possible for the crime of which the alien was convicted ... did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

8 U.S.C. § 1182(a)(2)(A)(ii)(II). The safeharbor provides no protection to petitioner, because by her guilty plea of November 2, 1994, she was convicted of Assault in the Second Degree (N.Y. Penal Law § 120.05).[2] And as a class D felony under

---

**2.** The statute reads, in its entirety:

§ 120.05. Assault in the second degree
A person is guilty of assault in the second degree when:
1. With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person; or
2. With intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or

New York law, the maximum penalty for second degree assault is seven years in prison. *See* N.Y. Penal Law § 70.00(2)(d). Because petitioner was convicted of a crime for which the maximum penalty exceeds one year, and because she was convicted of the crime within the five year statutory period, if the New York assault in the second degree is a crime involving moral turpitude, petitioner is ineligible for naturalization.

The question this case thus poses is whether second degree assault in New York is a crime involving moral turpitude. "Moral turpitude" historically has referred to conduct which "is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Matter of Torres–Varela*, 23 I. & N. Dec. 78, 83 (BIA 2001). In other words, there

3. With intent to prevent a peace officer, police officer, a fireman, including a fireman acting as a paramedic or emergency medical technician administering first aid in the course of performance of duty as such fireman, an emergency medical service paramedic or emergency medical service technician, or medical or related personnel in a hospital emergency department, from performing a lawful duty, by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such peace officer, police officer, fireman, paramedic or technician, he causes physical injury to such peace officer, police officer, fireman, paramedic, technician or medical or related personnel in a hospital emergency department; or

4. He recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or

5. For a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to him, without his consent, a drug, substance or preparation capable of producing the same; or

6. In the course of and in furtherance of the commission or attempted commission of a felony, other than a felony defined in article one hundred thirty which requires corroboration for conviction, or of immediate flight therefrom, he, or another participant if there be any, causes physical injury to a person other than one of the participants; or

7. Having been charged with or convicted of a crime and while confined in a correctional facility, as defined in subdivision three of section forty of the correction law, pursuant to such charge or conviction, with intent to cause physical injury to another person, he causes such injury to such person or to a third person; or

8. Being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly causes serious physical injury to such person; or

9. Being eighteen years old or more and with intent to cause physical injury to a person less than seven years old, the defendant causes such injury to such person; or

10. Acting at a place the person knows, or reasonably should know, is on school grounds and with intent to cause physical injury, he or she:

(a) causes such injury to an employee of a school or public school district; or

(b) not being a student of such school or public school district, causes physical injury to another, and such other person is a student of such school who is attending or present for educational purposes. For purposes of this subdivision the term "school grounds" shall have the meaning set forth in subdivision fourteen of section 220.00 of this chapter.

11. With intent to cause physical injury to a train operator, ticket inspector, conductor [fig 1], bus operator or station agent employed by any transit agency, authority or company, public or private, whose operation is authorized by New York state or any of its political subdivisions, he or she causes physical injury to such train operator, ticket inspector, conductor [fig 2], bus operator or station agent while such employee is performing an assigned duty on, or directly related to, the operation of a train or bus. Assault in the second degree is a class D felony.

is no useful definition for the term.[3] Nevertheless, whether a crime involves moral turpitude is a question of law to be decided by the court. *See Michel v. INS*, 206 F.3d 253, 262 (2d Cir.2000) ("[A] determination that the elements of a crime constitute moral turpitude for [immigration purposes] is a question of law.") (citation omitted); *Abimbola v. Ashcroft*, 378 F.3d 173, 176 (2d Cir.2004).

It is the practice in the Second Circuit to perform a categorical review of whether a crime involves moral turpitude; this means that the court looks only to the statute and not to the actual circumstances of the crime in a particular case. *See Dalton v. Ashcroft*, 257 F.3d 200, 204 (2d Cir.2001) ("In this Circuit, we have long endorsed categorical analyses of criminal statutes in the context of deportation orders for crimes of moral turpitude."). "The categorical approach focuses on 'the intrinsic nature of the offense rather than on the factual circumstances surrounding any particular violation.'" *Dickson v. Ashcroft*, 346 F.3d 44, 48 (2d Cir.2003), quoting *Dalton*, 257 F.3d at 204; *Abimbola*, 378 F.3d at 176–77 ("We must ask whether every set of facts violating a statute ... satisfies the criteria for removability, keeping in mind that only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant.") (citations and internal quotation marks omitted). The "touchstone" of moral turpitude is an evil or malicious intent. *Michel v. INS*, 206 F.3d at 263. Thus, courts look to the element of intent, specifically an evil or vicious intent, in the determination of whether a crime involves moral turpitude. *Id.* ("Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind."), (quoting *Hamdan v. INS*, 98 F.3d 183, 186 (5th Cir.1996)); *see also Kamagate v. Ashcroft*, 385 F.3d 144, 150 (2d Cir.2004) (citing *Jordan v. De George*, 341 U.S. 223, 227, 71 S.Ct. 703, 95 L.Ed. 886 (1951) for the proposition that "fraud has ordinarily been the test to determine whether crimes not of the gravest character involve moral turpitude"). A review of the United States Department of Justice Board of Immigration Appeals' ("BIA") moral turpitude cases noted some general results relevant here: according to the BIA, simple assault is not a crime of moral turpitude, but assault with a deadly weapon is; a conviction for misconduct that caused bodily injury is not a crime of moral turpitude, but where the conduct caused serious bodily injury, it is. *See Toutounjian v. INS*, 959 F.Supp. 598, 603–04 (S.D.N.Y.1997).

In *Toutounjian*, the court utilized the BIA's framework for establishing whether a prior conviction was for a crime of moral turpitude:

In determining whether a crime involves moral turpitude, we are limited in the first instance to an examination of the statute wherein the crime is defined. If the crime as defined does not necessarily of its essence comprehend moral turpitude, then the alien cannot be said to have committed a crime involving moral turpitude. Where, however, the statute is divisible or separable and so drawn as to include within its definition crimes which do and some which do not involve moral turpitude, the record of conviction, i.e., the information (complaint or indictment), plea, verdict and sentence

**3.** "Time has only confirmed Justice Jackson's powerful dissent in [*Jordan v. De George*, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951)], in which he called 'moral turpitude' an 'undefined and undefinable standard.' 341 U.S. at 235. The term may well have outlived its usefulness. But that is not for us to decide ...." *Mei v. Ashcroft*, 393 F.3d 737, 741 (7th Cir.2004).

may be examined to ascertain therefrom whether the requisite moral obloquy is present.

*Toutounjian,* 959 F.Supp. at 601 (quoting *Matter of P.,* 2 I. & N. Dec. 117, 119 (BIA 1944)). This is also a fair construction of the Second Circuit's review. *See United States ex rel. Zaffarano v. Corsi,* 63 F.2d 757, 758 (2d Cir. Mar.30, 1933).

I must first consider whether § 120.05 of the New York Penal Law is a divisible statute which includes some crimes involving moral turpitude and some that do not. The predecessor statute was considered divisible by the Second Circuit. *See United States ex rel Zaffarano v. Corsi,* 63 F.2d 757, 758 (2d Cir. Mar.13, 1933) ("Many of the crimes [in the predecessor statute] plainly involve moral turpitude.... But this is not true of all assaults included within the section."). It is long the law in the Second Circuit that assault with a deadly weapon is a crime of moral turpitude, and thus subdivision 2 is a crime involving moral turpitude. *See Zaffarano,* 63 F.2d at 758 ("It is conceded that assault with a dangerous weapon would be of this character."), (citing *United States ex rel. Ciccerelli v. Curran,* 12 F.2d 394 (2d Cir.1926)). All of the subdivisions of § 120.05, except subdivision 3 and subdivision 6, have an explicit requirement that the perpetrator intend to cause either physical injury or serious physical injury. *See* N.Y. Penal Law § 120.05. The subdivisions requiring explicit intent to cause serious physical injury[4] (1 and 4) are very likely crimes involving moral turpitude. *See Nguyen v. Reno,* 211 F.3d 692, 695 (1st Cir.2000) ("It is intrinsically wrong to cause serious physical injury intentionally to another person. We know of no civilian moral code, secular or religious, that permits one to seriously injure another person by assault while intending to do so."). Similarly, subdivisions 2, 7, 8, 9, 10, and 11, which require intent to cause physical injury,[5] are likely crimes involving moral turpitude, as an endorsed method of determining such crimes is to look to an evil or malicious intent, *see Michel v. INS,* 206 F.3d at 263, and an intent to cause someone injury is malicious, as well as contrary to accepted rules of morality and the duties owed between people. As for subdivision 6, causing physical injury during the commission or attempted commission of a felony, the BIA, construing a parallel federal statute, has required the underlying felony itself to be a crime involving moral turpitude before it will consider the assault to be such a crime. *See Matter of Short,* 20 I. & N. Dec. 136, 139 (BIA 1989) ("[I]f a simple assault does not involve moral turpitude and the felony intended as a result of that assault also does not involve moral turpitude, then the two crimes combined do not involve moral turpitude."). I think it thus fair to say that § 120.05 is a divisible statute. The Second Circuit made this determination in *Zaffarano* about the predecessor statute. 63 F.2d at 758. There is a strong argument that subdivision 6 can encompass conduct that would not involve moral turpitude, and it is at least possible that intent to cause physical injury (but not serious physical injury) also may not involve moral turpitude. I therefore determine which subdivision of the statute has been violated in this matter by looking

---

4. "Serious physical injury" is defined in New York as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10).

5. "Physical injury" is defined in New York as "impairment of physical condition or substantial pain." N.Y. Penal Law § 10.00(9).

to the record of conviction, here, the indictment.

The record of conviction reveals that petitioner pled guilty to the following crime charged in her indictment:

The grand jury of the County of Kings by this indictment, accuse the defendant of the crime of assault in the second degree (P.L. 120.05) committed as follows: The defendant, on or about January 13, 1994, in the County of Kings, with intent to prevent Daryl Hewitt, a police officer, from performing a lawful duty, caused physical injury to Daryl Hewitt.

*See* Exhibit 1 to Declaration of AUSA Scott Dunn. The current statutory provision under which petitioner was convicted is subdivision 3:

With intent to prevent a peace officer, police officer, a fireman, including a fireman acting as a paramedic or emergency medical technician administering first aid in the course of performance of duty as such fireman, an emergency medical service paramedic or emergency medical service technician, or medical or related personnel in a hospital emergency department, from performing a lawful duty, by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such peace officer, police officer, fireman, paramedic or technician, he causes physical injury to such peace officer, police officer, fireman, paramedic, technician or medical or related personnel in a hospital emergency department
. . . .

N.Y. Penal Law § 120.05(3). Removing all the language from the current provision irrelevant to petitioner's conviction, the current statute reads:

With intent to prevent a[ ] police officer ... from performing a lawful duty ...

he causes physical injury to such [ ] police officer.

The 1933 predecessor statute and the current statute are almost identical except for the requirement of physical injury in the current statute.

*Zaffarano* answers the question whether second degree assault in New York is a crime involving moral turpitude "not necessarily." 63 F.2d at 758. I think it useful to quote the entire discussion.

It has frequently been said that a mere assault does not involve moral turpitude. In New York, there are first, second, and third degree assaults. Section 242, N.Y. Penal Law, defines assaults of the second degree in five subdivisions. Many of the crimes so defined plainly involve moral turpitude. It is conceded that assault with a dangerous weapon would be of this character. But this is not true of all assaults included within the section. Subdivision 5 makes guilty of second degree assault one who "assaults another with intent to commit a felony, or to prevent or resist the execution of any lawful process or mandate of any court or officer, or the lawful apprehension or detention of himself, or of any other person."

Under this provision a man may be convicted for putting forth the mildest form of intentional resistance against an officer attempting to serve lawful process, levy an execution on goods, or apprehend or detain the accused or another. Such conduct, though usually meriting punishment more severe than prescribed for a simple assault upon a private person not acting in an official capacity, does not necessarily denote moral depravity in our opinion.

*Zaffarano*, 63 F.2d at 758 (citations omitted).

The year before *Zaffarano*, a Northern District court interpreted the statute as follows: "one may resist an officer in making an arrest through ignorance of the law or for some other ignorance, thereby making himself liable to conviction of assault, second degree, and yet not be guilty of moral turpitude." *United States ex rel. Valenti v. Karmuth*, 1 F.Supp. 370, 376 (N.D.N.Y.1932); *see also United States ex rel. Ciccerelli v. Curran*, 12 F.2d 394, 395 (2d Cir.1926) (recognizing that assault in the second degree consummated with a gun is a crime of moral turpitude). A review of the few cases construing the statute since 1933 demonstrates that *Zaffarano* is the last word on the second degree assault statute from the Second Circuit. Violation of current subdivision 3 would therefore "not necessarily denote moral depravity." *Zaffarano*, 63 F.2d at 758. *See, e.g., United States ex rel. Ciarello v. Reimer*, 32 F.Supp. 797, 798 (S.D.N.Y.1940) (citing *Zaffarano* and holding that using a deadly weapon may not even raise the second degree assault to a crime involving moral turpitude where there is evidence of provocation).

As noted above, in searching out the intrinsic nature of an offense, courts review the requirement of intent in the statute. No viciousness or maliciousness necessarily inheres in an intent to stop a police officer from effectuating an arrest.[6] The subdivision of the New York assault statute under which petitioner was convicted is strict liability in terms of causing

physical injury: "with intent to prevent a police officer ... from performing a lawful duty ... he causes physical injury to the police officer." N.Y. Penal Law § 120.05; *see People v. Rojas*, 97 N.Y.2d 32, 40, 735 N.Y.S.2d 470, 475, 760 N.E.2d 1265 (2001) ("a defendant's intent to injure is irrelevant to the crime of assault in the second degree under Penal Law § 120.05(3). A person who seeks to prevent a police officer from performing a lawful duty is criminally answerable under section 120.05(3) for injuring the officer, even when there is no intent to injure."); *People v. Campbell*, 72 N.Y.2d 602, 604, 535 N.Y.S.2d 580, 581, 532 N.E.2d 86 (1988) ("Under the plain wording of this subdivision it is evident that a defendant may be convicted even though the injury caused is unintended or accidental. The only proviso is that the injury must occur while the defendant is acting with the intention of preventing the police officer, fireman, paramedic or technician from performing a lawful duty."). Thus, there is no intent to cause injury in the statute, and it apparently remains since 1933 that one can utilize a small amount of force to resist arrest in New York and not commit a crime involving moral turpitude.

The fact that the predecessor statute did not require the police officer to sustain physical injury creates the only doubt about the above analysis. Every subdivision of the predecessor statute was moved to the current statute, however, and the

---

**6.** One of the majority opinions in *Michel* explicitly noted that the court does not have to identify the hypothetically most innocent manner in which to commit a crime. *Michel*, 206 F.3d at 265 n. 3 (Sotomayor, J.) (noting that there is no requirement to perform the "didactic exercise" of analyzing hypothetical cases); *but see Abimbola*, 378 F.3d at 176–77 ("We must ask whether every set of facts violating a statute ... satisfies the criteria for removability, keeping in mind that only the

minimum criminal conduct necessary to sustain a conviction under a given statute is relevant") (citations and internal quotation marks omitted). It is not so hard to identify examples where a mishap in the encounter leads to or causes an officer's injury: desperate parents holding off an arresting officer from their only child, or an officer attempting to move a permitless protester lying prone in the street.

intent to cause physical injury was imported to all of the subdivisions except 3 and 6. Furthermore, the Penal Law revision inserted the requirement of injury into all assaults without changing the nature or severity of any of the crimes. There is no authority, however, for the proposition that the addition of injury to the statute changes the nature of the offense so that it involves moral turpitude. So I conclude that, like the predecessor statute, the current statute is not a crime involving moral turpitude.

Respondents point to the BIA's construction of a Texas aggravated assault statute to support their argument that a conviction under § 120.05(3) is one involving moral turpitude. *See Matter of Danesh*, 19 I. & N. Dec. 669, 673 (BIA 1988). The BIA in *Danesh* does appear to have disagreed somewhat with the Second Circuit. But the BIA's conclusion as to a Texas statute is not controlling on this court; the Second Circuit's conclusion about the New York statute at issue here is. In any event, *Danesh* is distinguishable.

In *Danesh*, the BIA construed an aggravated assault statute which required the assaulted police officer to sustain bodily injury. *Danesh*, 19 I. & N. Dec. at 670 n. 1 (citing Tex. Penal Code Ann. § 22.02(a) (Vernon 1979)). In Texas, like New York, that the victim was an officer adds to the seriousness of an assault. But Texas' stat-utory scheme is different than New York's in a very important way. The Texas assault statute is violated when a person intentionally, knowingly, or recklessly causes injury to another, threatens another with imminent bodily harm, or causes physical contact with another in an offensive or provocative way. *See Danesh*, 19 I. & N. Dec. at 670 n. 1; *see also* Tex. Penal Code Ann. § 22.01(a) (Vernon 2004). "Intentionally, knowingly, or recklessly" is the required state of mind in each of the statutory provisions regarding assault.[7] Thus, the intentional nature of the injury or contact in the Texas statute makes it quite unlike the New York provision under which petitioner was convicted; the New York statute may be violated without any intent to harm the officer.

*Danesh* found that the assaulter's knowledge that his victim was a police officer satisfies the requirement that the statute contain the element of intent. But since the Texas scheme requires that the injury to the officer must be intentional anyway, such a finding was an unnecessary departure from earlier BIA precedents, which required the intent element to relate to the inherently immoral criminal act. In *Matter of Short*, for example, the BIA analyzed the federal assault statute, and held that assault with intent to commit a felony was not a crime of moral turpitude if the underlying felony was not a crime of moral turpitude. *See Short*, 20 I. & N.

---

7. The Texas aggravated assault statute at issue in *Danesh* provided that "[a] person commits an offense if he commits assault as defined in Section 22.01 of this code *and* he ... causes bodily injury to a peace officer when he knows or has been informed the person assaulted is a peace officer ... while the peace officer is discharging an official duty". Tex. Penal Code Ann. § 22.02(a)(2)(A) (Vernon 1979) (emphasis added). § 22.01 of the Texas Penal Code, the violation of which is a prerequisite to conviction for assault under section 22.02, provides that

[a] person commits an offense if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

*Id.* at § 22.01.

Dec. at 139. That conclusion was drawn from two ideas: i) that simple assault is not a crime of moral turpitude; and ii) that "[t]here must be some particular criminal activity with which to evaluate whether the nature of that activity involves moral turpitude." *Id.* No case holds that intentionally interfering with an officer's lawful duty is a crime involving moral turpitude without a separate requirement that the perpetrator intend to injure the officer as well.

Intentionally interfering with a police officer's lawful duty is simply not an inherently immoral act. When a person uses the "mildest form of intentional resistance," like the grieving parent might, and ends up causing bodily injury, she is not committing a crime involving moral turpitude. *See Campbell,* 72 N.Y.2d at 604, 535 N.Y.S.2d 580, 532 N.E.2d 86 ("In short, if a defendant, while intending to prevent one of the persons covered by the statute from performing a lawful duty, causes injury to that person—no matter how or why—he may be found guilty of assault second under subdivision (3)."). Cases construing the statute and finding enough injury to sustain convictions demonstrate that relatively mild force is all that is needed. *See, e.g., People v. Sullivan,* 284 A.D.2d 917, 918, 728 N.Y.S.2d 320, 322 (4th Dept.2001) (physical injury requirement satisfied where officer sustained soft tissue injury resulting in severe pain in his ankle and shin, causing pain and difficulty walking for two days and kept officer out of work for one and one-half days); *People v. Holiday,* 249 A.D.2d 624, 625, 670 N.Y.S.2d 986, 987 (3d Dept.1998) (requirement satisfied where officer experienced stiffness and swelling in his knee, was unable to move his leg normally, experienced soreness in his left achilles tendon, missed three days of work, was told to restrict work to only light duty for several weeks, and was diagnosed with a tear of the lateral meniscus in his left knee); *Peo-*

*ple v. Sheppard,* 202 A.D.2d 701, 702, 609 N.Y.S.2d 318, 319 (2d Dept.1994) (requirement satisfied where officer's hand was swollen, black and blue, and stiff, the officer sought treatment, the injury was painful, and the officer was not able to return to work for four days).

Last, with respect to *Danesh,* the BIA in that case relied on *Ciambelli ex rel. Maranci v. Johnson,* 12 F.2d 465 (D.Mass. 1926) for the proposition that it is possible for a second degree assault perpetrated without a weapon to be a crime involving moral turpitude: "[I]n *Ciambelli* it was indicated that a deliberate assault for the purpose of interfering with the performance of an officer's official duties might be considered as one involving moral turpitude since it evidences an inclination toward lawlessness." *Danesh,* 19 I. & N. Dec. at 673. *Danesh* conflates two separate lines of analysis from *Ciambelli,* packaging all of the bad acts together in a way which would more likely demonstrate moral turpitude. *Ciambelli,* however, said this:

> If one ordinarily law-abiding, in the heat of anger, strikes another, that act would not reveal such inherent baseness or depravity as to suggest the idea of moral turpitude. If, on the other hand, one deliberately assaulted an officer of the law with a dangerous weapon and with felonious intent, or for the purpose of interfering with the officer in the performance of his duty, the attendant circumstances showing an inclination toward lawlessness, the act might be well be considered as one involving moral turpitude. Between the two lies the line of demarcation which I do not undertake to define accurately.

*Ciambelli,* 12 F.2d at 466. *Ciambelli* would be wrong in the Second Circuit to the extent it looks to the "attendant circumstances" to determine moral turpitude.

This is because, as explained above, courts in the Second Circuit utilize the categorical approach, and "attendant circumstances showing an inclination toward lawlessness" are therefore irrelevant. The *Ciambelli* court was discussing a person deliberately assaulting the officer under one of two circumstances: 1) with a dangerous weapon and with felonious intent; or 2) for the purpose of interfering with the lawful duty, and where the circumstances show an inclination toward lawlessness. In both cases, the assault on the officer is "deliberate," i.e., intentional. In subdivision 3 of § 120.05, there is no deliberate assault, there is an intentional interference with the officer causing injury which is labeled assault. The *Ciambelli* court did not think that lawlessness was shown by interference with the officer, but rather that lawlessness could be shown by attendant circumstances, if such circumstances existed. And the fact that the court in *Ciambelli* "only determine[d] which side of the line the facts of [that] case [fell]" demonstrates that there could be circumstances of deliberately assaulting an officer which would not involve moral turpitude. *See Ciambelli*, 12 F.2d at 466.

In *Zaffarano*, the matter was remanded because the court did not know under which subdivision the noncitizen in that case had been convicted. The Second Circuit provided what can be characterized as strong guidance on how it might have ruled if it turned out that the conviction in that case was under the subdivision regarding assault on a police officer. *Zaffarano*, then, does not contain an actual hold-ing that the current second degree assault on a police officer is not a crime of moral turpitude. But even if *Zaffarano* is only the best evidence of the law in this circuit, and therefore there exists some doubt whether Penal Law § 120.05(3) is a crime involving moral turpitude, the rule of lenity requires that doubts be resolved against the government. *See Leocal v. Ashcroft*, 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (explaining that when interpreting criminal statutes, which have both criminal and noncriminal application, "the rule of lenity applies," even in immigration cases, because the statute must be interpreted "consistently").[8]

I note that moral turpitude is measured against contemporary moral standards and may be susceptible to change. *See United States v. Francioso*, 164 F.2d 163 (2d Cir. 1947) (recognizing that "the standard [i]s, not what we personally might set, but the commonly accepted mores: i.e. the generally accepted moral conventions current at the time, so far as we could ascertain them") (citations and internal quotation marks omitted). Even if contemporary moral standards exist and could be ascertained, a premise for which I have no confidence, the task of measuring such elusive standards is basically impossible. If, however, we live in a constantly progressing democracy, it must be that what did not involve moral turpitude seventy years ago cannot be said to involve it now.

Reviewing the intent requirement of the statute, and following *Zaffarano*, I arrive at a finding that subdivision 3 of § 120.05 is not a crime involving moral turpitude. I

---

**8.** While doubts about an applicant's eligibility for naturalization are resolved in the government's favor, *see Berenyi v. District Dir.*, 385 U.S. at 636–37, doubt about the interpretation of a criminal statute is resolved against the government. Any doubt in this case is not about petitioner's eligibility for naturalization, rather it is about whether a particular crime involves moral turpitude. Categorical analysis of the assault statute here cannot be affected by whether it is reviewed in a naturalization or deportation proceeding, or, for that matter, in a criminal context. There should be only one rule in this jurisdiction as to whether New York's second degree assault is a crime of moral turpitude.

therefore recommend denying respondents' motion for summary judgment and finding that petitioner is not ineligible for naturalization because of a conviction for a crime involving moral turpitude.

### IV. Conclusion

For the above stated reasons, I respectfully recommend that respondents' motion to dismiss petitioner's application to the court to accept jurisdiction be denied. I further recommend that the court accept jurisdiction and deny respondents' motion in the alternative for summary judgment. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72, 6(a), 6(e).

SO ORDERED.

