# IMMIGRATION AND NATURALIZATION SERVICE *v.* PANGILINAN ET AL.

No. 86–1992.   Argued February 24, 1988—Decided June 17, 1988*

*Together with No. 86–2019, *Immigration and Naturalization Service* v. *Manzano,* also on certiorari to the same court.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., concurred in the result. KENNEDY, J., took no part in the consideration or decision of the cases.

*Robert H. Klonoff* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Wallace,* and *Marshall Tamor Golding.*

*Donald L. Ungar* argued the cause for respondents. With him on the brief for respondent Pangilinan et al. were *Robert A. Mautino, Bill Ong Hing,* and *Susan Lydon. Robert A. Mautino* filed briefs for respondents Litonjua and Manzano.

JUSTICE SCALIA delivered the opinion of the Court.

The respondents, 16 Filipino nationals who served with the United States Armed Forces during World War II, claim they are entitled to apply for and receive American citizenship under a special immigration statute that expired over 40 years ago, §§ 701 to 705 of the Nationality Act of 1940, Ch. 876, 54 Stat. 1137, as amended by the Second War Powers Act of 1942, § 1001, Ch. 199, 56 Stat. 182, 8 U. S. C. §§ 1001 to 1005 (1940 ed., Supp. V) (1940 Act). In the decisions below[1] the Ninth Circuit has, for the third time, ordered naturalization under that expired provision. See *Mendoza* v. *United States,* 672 F. 2d 1320 (CA9 1982), rev'd, 464 U. S. 154 (1984); *INS* v. *Hibi,* 475 F. 2d 7 (CA9), rev'd, 414 U. S. 5 (1973). In part because the decision below was in direct conflict with the Second Circuit's decision in *Olegario* v. *United States,* 629 F. 2d 204 (CA2 1980), cert. denied, 450 U. S. 980 (1981), we granted certiorari.

# I

## A

In March 1942, Congress amended the immigration laws to make American citizenship more readily available to aliens who served honorably in the United States Armed Forces during World War II. As amended at that time, § 701 of the 1940 Nationality Act exempted those aliens from such naturalization requirements as five years of residency in the

---

[1] The two cases actually involve three lawsuits: two appeals (both part of No. 86–1992) that were consolidated in the Court of Appeals *(Pangilinan* v. *INS* and *Litonjua* v. *INS)* and a third *(INS* v. *Manzano,* No. 86–2019) that was consolidated by this Court with No. 86–1992.

United States and proficiency in the English language.[2]  Section 702 authorized representatives designated by the Commissioner of Immigration and Naturalization to receive petitions, conduct hearings, and grant naturalization outside the United States.[3]  And § 705 authorized the Commissioner, with the approval of the Attorney General, to make such rules

---

[2] Section 701 provided in pertinent part:

"[A]ny person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war and who, having been lawfully admitted to the United States, including its Territories and possessions, shall have been at the time of his enlistment or induction a resident thereof, may be naturalized upon compliance with all the requirements of the naturalization laws except that (1) no declaration of intention, and no period of residence within the United States or any State shall be required; (2) the petition for naturalization may be filed in any court having naturalization jurisdiction regardless of the residence of the petitioner; (3) the petitioner shall not be required to speak the English language, sign his petition in his own handwriting, or meet any educational test; and (4) no fee shall be charged or collected for making, filing, or docketing the petition for naturalization, or for the final hearing thereon, or for the certification of naturalization, if issued: *Provided, however,* That . . . the petition shall be filed no later than [December 31, 1946] . . . ."

[3] Section 702 provided in pertinent part:

"During the present war, any person entitled to naturalization under section [701] of this [Act], who while serving honorably in the military . . . forces of the United States is not within the jurisdiction of any court authorized to naturalize aliens, may be naturalized in accordance with all the applicable provisions of section 701 without appearing before a naturalization court.  The petition for naturalization of any petitioner under this section shall be made and sworn to before, and filed with, a representative of the Immigration and Naturalization Service designated by the Commissioner or a Deputy Commissioner, which designated representative is hereby authorized to receive such petition in behalf of the Service, to conduct hearings thereon, to take testimony concerning any matter touching or in any way affecting the admissibility of any such petitioner for naturalization, to call witnesses, to administer oaths, including the oath of the petitioner and his witnesses to the petition for naturalization and the oath of renunciation and allegiance prescribed by section 335 of this Act, and to grant naturalization, and to issue certificates of citizenship . . . ."

and regulations as were necessary to carry into effect the provisions of §§ 701 and 702.[4]

Over the next three years, approximately 7,000 Filipino soldiers were naturalized as American citizens in places outside the Philippine Islands (which were occupied during that entire period by Japan). Most of these were naturalized by courts in this country, but at least 1,000 others were naturalized by immigration officials appointed under § 702, traveling from post to post on rotation throughout England, Iceland, North Africa, and the islands of the Pacific. See *Hibi*, 414 U. S., at 10 (Douglas, J., dissenting). After the Philippines were liberated from Japanese occupation in August 1945, George Ennis, the American Vice Consul in Manila, was designated to naturalize aliens pursuant to the 1940 Act. Almost immediately after that, the Philippine Government began to express its concern that a mass migration of newly naturalized veterans would drain the country of essential manpower, undermining postwar reconstruction efforts in the soon-to-be independent country. Accordingly, on September 13, 1945, the Commissioner recommended to Attorney General Clark that Vice Consul Ennis' naturalization authority be revoked.[5] On October 26, 1945, Ennis was in-

---

[4] Section 705 provided in pertinent part:

"The Commissioner, with the approval of the Attorney General, shall prescribe and furnish such forms, and shall make such rules and regulations, as may be necessary to carry into effect the provisions of this Act."

[5] The Commissioner's memorandum to Attorney General Clark read in pertinent part:

"The Philippine Government again has expressed to the Department of State its concern because Filipino members of the armed forces of the United States are being naturalized even though they have always been domiciled in the Philippine Islands. Since the Islands are not embraced within the domain of any naturalization court, naturalization therein may be awarded only by an administrative official designated by me under the authorization of Section 702 of the Nationality Act, 8 U. S. C. § 1002. Mr. George H. Ennis, Vice Consul of the United States at Manila, has been

formed of that revocation. For the next nine months no official with § 702 authority to receive and act upon petitions for naturalization was present in the Philippines, the Immigration and Naturalization Service (INS) apparently taking the position that appointment of such an official was authorized but not mandated. Not until August 1946 did the INS designate a new § 702 official for the Philippines, who naturalized approximately 4,000 Filipinos before the December 31, 1946, expiration date of the 1940 Act.

## B

Attorney General Clark's revocation of Vice Consul Ennis' naturalization authority during those nine months of 1945 and 1946 has led to a stream of litigation involving efforts by Filipino veterans to obtain naturalization under the expired 1940 Act. In the suits we have before us here, all of the respondents except Mario Valderrama Litonjua and Bonifacio Lorenzana Manzano filed their petitions in the United States District Court for the Northern District of California. The INS has stipulated that all of these 14 respondents (the *Pangilinan* respondents) were eligible for naturalization under the 1940 Act and were present in the Philippines during the period from October 1945 to August 1946, though they had not taken affirmative steps to be naturalized before the cutoff date. The naturalization examiner who handled these cases recommended against naturaliza-

---

designated to grant naturalizations under Section 702, but I do not believe he has as yet exercised his authority.

"In view of the concern expressed by the Philippine Government, it is my belief that that situation might best be handled by revoking the authority previously granted to Mr. Ennis and by omitting to designate any representative authorized to confer citizenship in the Philippine Islands. This course would eliminate a source of possible embarrassment in our dealings with the Philippine people, who probably will be awarded independence in the near future." Memorandum to Tom C. Clark, Attorney General, from Ugo Carusi, INS Commissioner, dated September 13, 1945, quoted in *Matter of Naturalization of 68 Filipino War Veterans*, 406 F. Supp. 931, 936, n. 5 (ND Cal. 1975).

tion, and the District Court decided against naturalization, relying on the Second Circuit's decision in *Olegario*. The naturalization petitions were consolidated for purposes of appeal to the Ninth Circuit.

Respondent Litonjua's petition for naturalization was filed in the United States District Court for the Southern District of California. Litonjua had served as a member of the United States Navy from May 1941 to April 1946, but had made no effort to apply for naturalization while on active duty. He made preliminary efforts to obtain citizenship while working as a civilian employee of the United States Army in Seattle, Washington, after his discharge, but he did not complete the petition process before the December 31, 1946, cutoff date. The naturalization examiner recommended against naturalization, and the District Court concurred, for reasons similar to those adopted by the District Court in *Pangilinan*.

Respondent Manzano also petitioned for naturalization in the Southern District of California. His situation was the same as that of the *Pangilinan* respondents, except that he claims that in July 1946, after completing his military service, he specifically inquired at the American Embassy in the Philippines about the possibility of obtaining citizenship but was told there was no longer anyone there to assist him. The District Court, following the recommendation of the naturalization examiner, denied the petition for reasons similar to those adopted by the District Courts in *Pangilinan* and *Litonjua*.

The appeals of the *Pangilinan* respondents and Litonjua were filed in 1980 and 1981 and were consolidated by the Court of Appeals (No. 86–1992). Manzano's appeal (No. 86–2019) was filed later and assigned to a different panel. The Ninth Circuit initially decided the *Pangilinan-Litonjua* consolidated cases by relying on the collateral-estoppel theory of its *Mendoza* decision, which had not yet been reversed by this Court. We vacated that judgment in light of our ruling

in *Mendoza. INS* v. *Litonjua,* 465 U. S. 1001 (1984), vacating and remanding *Barretto* v. *United States,* 694 F. 2d 603 (CA9 1982). On remand, the Ninth Circuit held that the revocation of Vice Consul Ennis' naturalization authority violated what it characterized as the mandatory language of §§ 702 and 705 of the 1940 Act, and that the naturalization of the respondents was an appropriate equitable remedy. *Pangilinan* v. *INS,* 796 F. 2d 1091 (CA9 1986). After this decision was announced, the panel in No. 86–2019 reversed and remanded to the District Court for reconsideration in light of the *Pangilinan* decision, characterizing the two cases as nearly identical. In 86–1992, the INS' petition for rehearing with suggestion for rehearing en banc was denied, with Judge Kozinski (writing for himself and seven others) dissenting. *Pangilinan* v. *INS,* 809 F. 2d 1449 (CA9 1987). We granted the INS' petition for a writ of certiorari. 484 U. S. 814 (1987).

## II

### A

Article I, § 8, cl. 4, of the Constitution provides: "The Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization . . . ." Sections 701, 702, and 705 of the amended 1940 Act, set forth in the margin above, constitute a complete description of the extent of the liberalized naturalization rights conferred under that exclusive constitutional authority in 1942. Section 701 explicitly limits the benefits to those who filed petitions no later than December 31, 1946. Moreover, Congress has again exercised its exclusive constitutional power to provide that any petition for naturalization filed on or after September 26, 1961, will be heard and determined under the 1952 Nationality Act, as amended. See § 310(e), 75 Stat. 656, 8 U. S. C. § 1421(e). Respondents concede that they are not entitled to be naturalized under that law. Brief for Respondent Pangilinan in Opposition 12–13. Since all the petitions for naturalization in this case were filed after December 31, 1946, and even after Septem-

ber 26, 1961, it is incontestable (and uncontested) that respondents have no statutory right to citizenship.

In *INS* v. *Hibi*, 414 U. S. 5 (1973), we summarily reversed the holding of the Ninth Circuit that the same official acts alleged here gave rise to an estoppel that prevented the Government from invoking the December 31, 1946, cutoff in the 1940 Act. We said that normal estoppel rules applicable to private litigants did not apply to the INS since, "in enforcing the cutoff date established by Congress, as well as in recognizing claims for the benefits conferred by the Act, [the INS] is enforcing the public policy established by Congress." *Id.*, at 8.

Although the Ninth Circuit's holding in the present cases rests upon a somewhat different theory—not that estoppel eliminates the effectiveness of the December 31, 1946, cutoff, but that equitable authority to craft a remedy enables the conferral of citizenship despite that cutoff—we think our reasoning in *Hibi* quite clearly produces the same result. The reason we expressed why estoppel could not be applied, viz., that that doctrine could not override a "public policy established by Congress," surely applies as well to the invocation of equitable remedies. Even assuming the truth of the Ninth Circuit's unsupported assertion that "[i]n reviewing naturalization petitions, federal courts sit as courts of equity," 796 F. 2d, at 1102, it is well established that "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Hedges* v. *Dixon County*, 150 U. S. 182, 192 (1893). "A Court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law . . . ." *Rees* v. *Watertown*, 19 Wall. 107, 122 (1874). See also, *e. g.*, *Thompson* v. *Allen County*, 115 U. S. 550, 555 (1885); 1 J. Story, Equity Jurisprudence § 19 (W. Lyon ed. 1918).

More fundamentally, however, the power to make someone a citizen of the United States has not been conferred upon

the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers. See, *e. g.*, 28 U. S. C. § 1361; 28 U. S. C. § 1651. Rather, it has been given them as a specific function to be performed in strict compliance with the terms of an authorizing statute which says that "[a] person may be naturalized . . . in the manner and under the conditions prescribed in this subchapter, *and not otherwise.*" 8 U. S. C. § 1421(d) (emphasis added).

> "An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." *United States* v. *Ginsberg*, 243 U. S. 472, 474 (1917).

Or as we have more recently said: "'Once it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship.'" *Fedorenko* v. *United States*, 449 U. S. 490, 517 (1981) (citation omitted).

The congressional command here could not be more manifest. Besides the explicit cutoff date in the 1940 Act, Congress in 1948, adopted a new liberalized citizenship program that excluded Filipino servicemen, and specifically provided that even applications timely filed under the 1940 Act and still pending would be adjudged under the new provisions. Act of June 1, 1948, Ch. 360, 62 Stat. 281. These provisions were carried forward into the 1952 Nationality Act, see 66 Stat. 250, 8 U. S. C. § 1440. (It is particularly absurd to contemplate that Filipinos who actually filed their applications before the 1946 cutoff were denied citizenship by reason of this provision, whereas the present respondents, who filed more than 30 years after the deadline, were awarded it by the Ninth Circuit.) Finally, in 1961, Congress amended the 1952 Act by adding § 310(e), 8 U. S. C. § 1421(e), which specifies that "any" petition thereafter filed will be adjudged

under the requirements of the 1952 Act. Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations.

## B

Respondents advance as an alternative ground for affirmance the claim that Attorney General Clark's revocation of Vice Consul Ennis' naturalization authority deprived them of their rights under the Due Process Clause of the Fifth Amendment and under its equal protection component. See *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 100 (1976). Assuming that these respondents can properly invoke the protections of the United States Constitution, and granting that they are members of a special class that Congress intended to favor with statutory entitlements to naturalization, they were not deprived of those entitlements without due process. First, it did not violate due process for Congress to impose a reasonable limitations period upon the filing of naturalization petitions. Cf. *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 437 (1982). Second, even assuming that a reasonable opportunity to file for naturalization was required, respondents were accorded at least that. Unlike noncitizen servicemen in other parts of the world, they had the continuous presence of a § 702 naturalization officer in the Philippines from August 1945 through October 1945, and from August 1946 to the end of that year. In this last period, the officer naturalized approximately 4,000 Filipinos. In addition, approximately another 7,000 Filipinos were naturalized either in this country or by naturalization officers traveling post to post around the world. We do not agree with respondents' contention that in addition to these ample opportunities, respondents were entitled as a matter of due process to individualized notice of any statutory rights and to the continuous presence of a naturalization officer in the Philippines from October 1945 until July 1946.

We also reject the possibility of a violation of the equal protection component of the Fifth Amendment's Due Process Clause. The approximately 7-month presence of a naturalization officer in the Philippines not only met the applicable standard of equal protection, but indeed compared favorably with the merely periodic presence of such officers elsewhere in the world. See generally *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977); *Mathews* v. *Diaz*, 426 U. S. 67, 79–83 (1976). Moreover, beyond the absence of any unequal treatment, the historical record lends no support whatever to the contention that the actions at issue here were motivated by any racial animus. Indeed, it is fair to assume that the Filipino soldiers who fought so valiantly during the early months of World War II were regarded with especial esteem when this legislation was enacted and implemented. Every court to consider this matter has observed that Attorney General Clark's and Commissioner Carusi's decisions were taken in response to the concerns of Philippine officials that their nation would suffer a manpower drain, and not because of hostility towards Filipinos. See n. 5, *supra*. Thousands of Filipinos were naturalized outside the Philippines during the period in question, and approximately 4,000 more in the Philippines after a successor to Ennis was appointed in August 1946.

## C

Respondents Litonjua and Manzano argue that the Government cannot prevail in their cases even if it prevails with respect to the 14 *Pangilinan* respondents because it did not introduce any evidence in their cases concerning the historical events at issue. This argument fails, since "it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect," *Berenyi* v. *District Director, INS*, 385 U. S. 630, 637 (1967). We also reject respondent Litonjua's assertion that his claim should be treated differently because he is within that category of veterans ("Category I" as described in *Matter of*

*Naturalization of 68 Filipino War Veterans*, 406 F. Supp. 931, 937–940 (ND Cal. 1975)) whose petitions it has been the policy of the Government not to oppose. That category includes only veterans who had taken some affirmative steps to obtain naturalization both before the December 31, 1946, cutoff date and while they were still on active duty. *Ibid.* Litonjua made his first efforts after he was no longer on active duty with the Armed Forces.

We have considered Litonjua's and Manzano's other separate claims and have found none that is meritorious.

* * *

For the reasons stated, the judgments of the Court of Appeals are reversed.

*It is so ordered.*

JUSTICE BLACKMUN concurs in the result.

JUSTICE KENNEDY took no part in the consideration or decision of these cases.