[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 20, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15748
Non-Argument Calendar

_____

Agency No. A96-101-608

SILVIO MAURICIO TAMAYO VALENCIA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 20, 2006)**

Before TJOFLAT, HULL and FAY, Circuit Judges.

PER CURIAM:

Silvio Mauricio Tamayo Valencia (herein "Valencia"), a Colombian national, petitions for review of the Board of Immigrations Appeals' ("BIA") decision adopting and affirming an Immigration Judge's ("IJ") order of removal and denial of his asylum and withholding of removal claims, as well as his claim for relief under United Nations Convention Against Torture ("CAT").[1] On appeal, Valencia challenges the constitutionality of the one-year filing deadline and the "internal resettlement" rule, and further argues that the IJ improperly concluded that (1) his application for asylum was time-barred; (2) he was not entitled to withholding of removal; and (3) he failed to prove that resettlement in Colombia was not a viable option. For the reasons set forth more fully below, we dismiss the petition in part and deny in part.

Valencia was admitted into the United States on or about October 10, 1998, as a non-immigrant visitor with authorization to remain until April 9, 1999. Valencia filed an application for asylum and withholding of removal dated October 25, 2002, and later was served with a notice to appear charging him with removability for remaining in the United States for a longer time than permitted, INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B).

In his application, Valencia stated that he received death threats from the

---

[1] Valencia does not challenge the denial of relief under the CAT. Therefore, the claim is abandoned. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

National Liberation Army (ELN), a guerilla group, because he refused to collaborate with them and disagreed with their political ideology, and he feared that, if returned to Colombia, he would be captured and tortured or killed for not complying with the ELN's demands. Valencia admitted that his application for asylum was submitted more than one year after he arrived in the United States, and stated that he was not aware of the asylum option until his cousin informed him of it, and he was afraid to enter into immigration proceedings because he thought he would be deported.

Submitted as evidence was a 1997 "Profile of Asylum Claims" for Colombia. It identified the ELN as one of several guerilla groups that target people who refuse to submit to recruitment or extortion. It also, however, indicated that relocation was a viable option for many applicants. The 2001 State Department Report on Human rights indicated that a large majority of political killings were attributable to paramilitary groups, such as the ELN. The ELN regularly attacked civilian populations, committed massacres, and killed medical and religious personnel. The report further indicated that the ELN and the FARC together commanded an estimated 21,645 combatants and undertook action in nearly 1,000 of Colombia's 1,097 municipalities.

Next, Valencia submitted numerous articles discussing the possibility of

3

temporary protected status for Colombian immigrants seeking asylum, as well as a few articles discussing kidnaping. He also submitted notarized statements of people who know him, and each statement avers that Valencia is a commercial pilot and a good person who was forced to leave Colombia because he was threatened and feared for his life. One of the statements indicated that Valencia left Colombia "due to motives of security," the political and social situation, and to "seek better living conditions." Also submitted was a police report, taken on August 22, 1998, wherein Valencia complained to authorities that he had been receiving anonymous phone calls with death threats from someone identifying himself with the ELN.

Through counsel, Valencia admitted the allegations in the notice to appear and conceded removability. Valencia testified that he was born and lived in Cali for his entire life prior to coming to the United States, and completed education as a commercial pilot from 1992 to 1994. He then obtained a job as a car salesman. Both of his parents, as well as his brother and sister continue to live in Cali.

Valencia testified that, from 1992 to 1998, he was a member of the "Liberal Youth of Cali," and helped support a candidate for mayor by distributing flyers and recruiting potential voters to hear the candidate speak. He sought asylum in the United States because his life was in danger as a result of the National Liberation

4

Army (ELN). Consistent with his application, Valencia stated that the ELN stopped him at a military roadblock and took all of his documents, including his military license, driver's license, pilot identification card, and bank cards. Later, in April 1997, Valencia's parents received a phone call seeking to verify and match information the caller possessed regarding their address. Valencia believed the caller to be a member of the ELN because he didn't have many friends, and no one he knew would have needed to verify whether or not he lived at that address.

According to Valencia, in April 1998 (one year later), he was organizing the public appearance of a political candidate when an ELN member approached him and told Valencia to stop playing the role of a politician and join the "true cause." The man told Valencia that he would "pay for the offense." Valencia did not report the incident to police for fear that something might happen to him or his family. Later, in May 1998, a man identifying himself as the ELN called Valencia at his home and told Valencia that he and Valencia had a pending matter. The man told Valencia that he had to do what the ELN wanted, and that they wanted to recruit him.

In June 1998, a man called Valencia and told him that he would meet Valencia at his car dealership. Three weeks later, Valencia was leaving work when a man stopped him and said they "needed people like [him]" and that Valencia

5

should provide a list of pilots as soon as possible.  Valencia refused to provide the list and was never physically harmed, although he testified that he feared for his life.  He did not report the incident to police until shortly before he decided to leave Colombia, and then only to report anonymous phone calls.  Since his arrival in the United States, nothing happened to his remaining family in Colombia.  However, Valencia testified that if returned, he would be captured, tortured, and possibly killed by the ELN because they had assured him he would pay for the offense of not agreeing with their ideals.

On cross-examination, Valencia admitted that his parents were also Liberal Party supporters, although they never actively campaigned for any candidates.  He further testified that, after he stopped working at the car dealership, he "hid out" at his home address, the same address that he had been living at his entire life.  He hid there because he was with his family and it was the only safe place.  When further questioned, Valencia admitted that his sister had a home at a different address five minutes away, and that he had not thought about living there at the time.

The IJ issued an oral decision, first finding that Valencia was time-barred from seeking asylum.  Next, it found that "the tragic and widespread danger that face[s] all citizens of Colombia as a result of the civil strife and anarchy does not in

6

and of itself establish <u>per se</u> persecution." It found that the ELN's efforts to recruit Valencia did not impute any political opinion to him, and, furthermore, it was not clear that the ELN had any specific information about Valencia's membership in the Liberal Youth Movement, but rather wanted to obtain a list of pilots. The IJ also found that Valencia had always lived in the same house in Cali, and, therefore, failed to establish country-wide fear of persecution or that it was unreasonable to have explored internal resettlement. Finally, it found that Valencia had not established a clear probability of harm or torture, and, thus, failed to establish that he was entitled to either withholding of removal or CAT relief.

Valencia appealed the IJ's decision to the BIA, arguing that: (1) the IJ erred by finding that Valencia suffered no more than the widespread danger facing all citizens of Colombia; (2) the one-year bar for filing asylum claims was unconstitutional under the Supremacy and Due Process Clauses; and (3) the internal relocation rule was unconstitutional and improperly applied in this case because Valencia's reasonable fears rendered the rule irrelevant.

The BIA adopted and affirmed the IJ's decision, specifically concurring with the IJ's finding that Valencia was time-barred from filing for asylum. It further concurred that Valencia failed to meet his burden of proof with respect to withholding of removal and CAT relief, noting that he has several family members

7

living in his home town, even in the same house where he previously lived, that remained unharmed. The BIA also found that Valencia had failed to show that the government of Colombia had tortured him or would torture him in the future and that he admitted to not attempting to relocate outside of Cali. Finally, the BIA declined to rule on Valencia's constitutional challenges to the one-year time-bar and internal resettlement rule because it was not empowered to do so.

Since the passage of the REAL ID Act of 2005, the permanent rules are applicable to all petitions for review, and, therefore, the permanent rules apply to Valencia's petition as well. See Tovar-Alvarez v. U.S. Att'y Gen., 427 F.3d 1350, 1351 (11th Cir. 2005). We will review only the BIA's decision, except to the extent that it expressly adopts the IJ's opinion. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citation omitted). Insofar as the BIA adopts the IJ's reasoning, this Court will review the IJ's decision as well. Id. (citation omitted).

On appeal, Valencia first argues that the IJ improperly applied the one-year time bar to his asylum claim. While Valencia argues that certain factual matters support his claim for asylum, his principal challenge is that the one-year time bar for filing asylum claims violates the Supremacy Clause of the U.S. Constitution and due process because it does not comport with the United Nations Convention of the Status of Refugees.

We review de novo questions of subject matter jurisdiction. Brooks v. Ashcroft, 283 F.3d 1268, 1272 (11th Cir. 2002). Questions of constitutional law are also reviewed de novo. Loyd v. Alabama Dep't of Corrections, 176 F.3d 1336, 1339 (11th Cir. 1999).

As amended by IIRIRA, INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B), provides that an alien may not apply for asylum unless he demonstrates by clear and convincing evidence that the application was filed within one year of his arrival in the United States. A late application for asylum may be considered if the alien demonstrates to the Attorney General's satisfaction the existence of either changed circumstances or extraordinary circumstances relating to the delay in filing the application. See INA § 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D). Pursuant to § 1158(a)(3), however, "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." INA § 208(a)(3), 8 U.S.C. § 1158(a)(3).

In May 2005, Congress passed the REAL ID Act of 2005, which amended the judicial review provisions of INA § 242(a), 8 U.S.C. § 1252(a), to permit review of all constitutional claims and questions of law, notwithstanding any other provision of the statute.[2] See REAL ID Act, Pub. L. 109-13, 119 Stat 231

---

[2] The amendment adds § 242(a)(2)(D) to read: "Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial

9

§ 106(a)(1)(ii) (May 11, 2005).

We have concluded that, even in light of the REAL ID Act, we lack jurisdiction to review whether a petitioner had filed his asylum application within one year or established extraordinary circumstances. See Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 957 (11th Cir. 2005). Holding that such determinations were factual and discretionary, we adhered to our "existing precedent that 8 U.S.C. § 1158(a)(3) divests us of jurisdiction to review a decision regarding whether an alien complied with the one-year time limit or established extraordinary circumstances that would excuse his untimely filing." Id. Accordingly, the propriety of the IJ's determination that Valencia's application for asylum is time barred and we dismiss the petition for lack of jurisdiction. However, Valencia's constitutional challenges and his withholding of removal claim will be addressed.

As to Valencia's constitutional challenge to the one-year time-bar, the Supremacy Clause provides as follows:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding

---

review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section."

U.S. Const. Art. VI, cl. 2. With respect to the Supremacy Clause, the Supreme

Court explained the relationship between a treaty and a federal statute as follows:

> A treaty is primarily a contract between two or more independent nations, and is so regarded by writers on public law . . .When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect . . . If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment . . . By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other: provided, always, the stipulation of the treaty on the subject is self-executing.

Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888).

Valencia cites to Chapter I, Art 1, Sub. F of the U.N. Convention[3] in his

brief, which reads:

> The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

>> (a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

---

[3] The United States is not a signatory to the U.N. Convention itself, but rather to the Protocol, which bound all signatories to comply with the substantive provisions of Articles 2-34. See I.N.S. v. Stevic, 467 U.S. 407, 416, n.9, 104 S.Ct. 2489, 2494, n.9, 81 L.Ed.2d 321 (1984).

11

(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
(c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

Protocol Relating to the Status of Refugees, Nov. 1, 1968, Ch. I., Art. 1, Sub. F, 19 U.S.T. 6223. Valencia argues that this provision is essentially the only limitation to granting an alien political asylum.

Notwithstanding the numerous other provisions of the treaty establishing limitations on its applicability to certain aliens (see, e.g, Art I. Ch. 1, Subs. C-E), Valencia ignores two other important provisions of the convention and protocol, as well as the manner in which the United States has chosen to comply. The first is Chapter III, Art. 34, which reads:

The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and costs of such proceedings.

Protocol Relating to the Status of Refugees, Nov. 1, 1968, Ch. III., Art. 34, Sub. F, 19 U.S.T. 6223.

The United States Supreme Court has explained that the United States has met its obligation to comply with this Article by establishing discretionary relief in the form of asylum for those aliens who qualify as refugees under the INA. See I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 441, 107 S.Ct. 1207, 1218, 94 L.Ed.2d

12

434 (1987).

The second is Chapter III, Art. 33, which states:

(1) No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

(2) The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

Protocol Relating to the Status of Refugees, Nov. 1, 1968, Ch. III., Art. 33, Sub. F, 19 U.S.T. 6223.

The Supreme Court has noted that neither Article 33 nor Article 34 of the Protocol are self-executing or precatory. See I.N.S. v. Chevic, 467 U.S. 407, 426, n.22, 104 S.Ct. 2489, 2500 n.22, 81 L.Ed.2d 321 (1984) (stating that Article 34 is not self-executing); Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. at 1218 (describing Article 33 as precatory); see also Haitian Refugee Center, Inc. v. Baker, 949 F.2d 1109, 1110 (11th Cir. 1992) (holding that Article 33 is not self-executing). Furthermore, the Third Circuit has persuasively rejected the same argument made here on grounds that the treaty is not self-executing. Sukwanputra v. Gonzales, 434 F.3d 627, 631-32 (3d Cir. 2006). Thus, we conclude that,

13

because the Protocol is not self-executing, there can be no violation of the Supremacy Clause.

As to Valencia's due process argument, his main point appears to be that the time limit is arbitrary and unreasonable. "Due process requires that aliens be given notice and opportunity to be heard in their removal proceedings." Fernandez-Bernal v. U.S. Att'y Gen., 257 F.3d 1304, 1310 n.8 (11th Cir. 2001). The Supreme Court has held that due process is not violated when Congress imposes a reasonable limitations period on the filing of naturalization petitions. I.N.S. v. Pangilinan, 486 U.S. 875, 885, 108 S.Ct. 2210, 2217, 100 L.Ed.2d 882 (1988). As the Third Circuit has persuasively held, "[t]he one-year period of limitations for filing an asylum application under 8 U.S.C. § 1158(a)(2)(B), which is tempered by the tolling provisions of § 1158(a)(2)(D), provides an asylum applicant an opportunity to be heard at a meaningful time and in a meaningful manner." Sukwanputra, 434 F.3d at 632. Moreover, the "one-year period is not an unreasonable requirement for triggering the right to an adjudication, and, thus, an alien is not deprived of due process when his or her asylum claim is denied for failure to comply with the requirement." Id. We agree, and conclude Valencia's constitutional challenges to the one-year time-bar lack merit.

Valencia next argues that the IJ erred by finding that he suffered only the

14

"tragic and widespread danger that face[s] all citizens in Colombia as a result of the civil strife and anarchy," because specific facts demonstrate that Valencia's political opinion led to his refusal to give the ELN a list of pilots, and, therefore his refusal to provide cooperation to the ELN, based on his own political convictions, proved that he was entitled to relief. He further argues that the "internal resettlement" rule is unconstitutional and it was unreasonable to request a pilot fearing for his life to try to resettle in Colombia when the ELN has a country-wide presence.

To the extent that the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). As noted above, questions of constitutional law are also reviewed de novo. Loyd, 176 F.3d at 1339. The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004).

15

An alien who arrives in or is present in the United States may apply for asylum.[4]  See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1).  The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee."  See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (emphasis supplied).  The asylum applicant carries the burden of proving statutory "refugee" status.  See Al Najjar, 257 F.3d at 1284.  To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor, in this case political opinion, will cause such future persecution.  8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287.  The INA does not expressly define "persecution" for

---

[4] While Valencia's asylum claim is not at issue in this appeal, the terminology and definitions relevant to asylum claims are similarly relevant to the withholding of removal claims raised in this appeal.  We note that the burden of proof for asylum claims is less stringent than the burden of proof with respect to withholding of removal claims.  Al Najjar, 257 F.3d at 1292-93.

16

purposes of qualifying as a "refugee." See INA § 101(a)(42), 8 U.S.C.

§ 1101(a)(42). However, we have discussed other circuits' holdings that

"persecution" is an "extreme concept," requiring more than "a few isolated

incidents of verbal harassment or intimidation," or "[m]ere harassment." Sepulveda

v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

A showing of past persecution creates a presumption of a "well-founded

fear," subject to rebuttal by the INS. 8 C.F.R § 208.13(b)(1). A "well-founded

fear" of persecution may also be established by showing a reasonable possibility of

personal persecution that cannot be avoided by relocating within the subject

country. 8 C.F.R. § 208.13(b)(2)(i) & (ii). It is "well-established" that the well-

founded fear inquiry contains both an objective and subjective component, i.e., the

petitioner must be genuinely afraid and that fear must be objectively reasonable.

Al Najjar, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present

"specific, detailed facts showing a good reason to fear that he or she will be singled

out for persecution." Id. at 1287 (internal quotation, emphasis, and citation

omitted). We have further held that, "where the alleged persecutors are not

affiliated with the government, it is not unreasonable to require a refugee who has

an internal resettlement alternative in his own country to pursue that option before

seeking permanent resettlement in the United States, or at least to establish that

17

such an option is unavailable." Sepulveda, 401 F.3d at 1231.

As for withholding of removal, an alien "must show that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004). "An alien bears the burden of demonstrating that he more-likely-than-not would be persecuted or tortured upon his return to the country in question." Id. "If the alien establishes past persecution in his country based on a protected ground, it is presumed that his life or freedom would be threatened upon return to his country unless the INS shows by a preponderance of the evidence that, among other things, (1) the country's conditions have changed such that the applicant's life or freedom would no longer be threatened upon his removal; or (2) that the alien could avoid a future threat to his life or freedom by relocating to another part of the proposed country of removal, and it would be reasonable to expect him to do so." Id. "An alien who has not shown past persecution, though, may still be entitled to withholding of removal if he can demonstrate a future threat to his life or freedom on a protected ground in his country." Id. "An alien cannot demonstrate that he more-likely-than-not would be persecuted on a protected ground if the IJ finds that the alien could avoid a future threat by relocating to another part of his country." Id.

18

In Sanchez, we held that a petitioner was not entitled to withholding of removal because she had failed to provide any evidence of her political opinion, actual or imputed, or of a nexus between her opinion and the alleged persecution. Id. at 438. There, the petitioner refused to meet with a FARC commander because she disagreed with the way the FARC had destroyed the country, prompting the FARC to demand 20 million pesos from her. Id. at 436. In rejecting the petitioner's claims, we noted that the evidence suggested that the FARC had harassed her for her failure to cooperate, which was insufficient to prove that she qualified for withholding of removal. Id. at 438.

The evidence here is that the ELN threatened Valencia by saying that he would pay for his offense, although it is unclear whether the offense was telling the ELN member that he did not support the ELN's cause or that Valencia was campaigning for the Liberal Party. Even assuming that it was related to Valencia's actions on behalf of a Liberal candidate, it amounted to only one threat, and Valencia was never harmed. This was insufficient to demonstrate past persecution, and, therefore, insufficient to meet the burden of proof for withholding of removal. Sepulveda, 401 F.3d at 1231 (holding that menacing threats and telephone calls were not sufficient to prove that the petitioner suffered past persecution); Al Najjar, 257 F.3d at 1292-93 (noting that the failure to meet the well-founded fear

19

burden of proof for asylum necessarily means a failure to meet the more stringent burden of proof for withholding of removal).

The remainder of the ELN's interest appears to be related not to Valencia's political opinion, but to his unwillingness to provide a list of pilots. Similar to Sanchez, the record here suggests that Valencia feared reprisal for his failure to cooperate with the ELN, not because the ELN was opposed to his political opinions. Thus, like in Sanchez, the evidence is not sufficient to show that Valencia will be persecuted in the future because of his political opinion. Sanchez, 392 F.3d at 438 ("It is not enough to show that [the petitioner] was or will be persecuted or tortured due to her refusal to cooperate with the guerillas."). In any event, Valencia received phone calls and threats, and that is not sufficient to meet the "extreme concept" of persecution. Sepulveda, 401 F.3d at 1231.

Moreover, the record shows that Valencia lived in the same place his entire life, and did not attempt to change his address, even choosing to "hide out" there when he could have stayed with his sister at a different location within Cali. While we have noted that the use of the State Department's country reports is not enough, standing alone, to warrant a finding that a petitioner could viably relocate to an area where the ELN was non-existent or minimal, Valencia here, like in Sepulveda, has failed to show that he will be "singled out" for persecution on the basis of a

protected ground, or, for that matter, why the ELN would still be interested in him seven years later, and we conclude that the IJ did not err by finding that Valencia had failed to demonstrate that internal resettlement was not a viable option. Sepulveda, 401 F.3d at 1232 n.7.

It is noted that, in Arboleda v. U.S. Att'y Gen., 434 F.3d 1220, 1224-26 (11th Cir. 2006), we concluded that the 2000-2001 Country Reports established that the FARC has a country-wide presence in Colombia, and the government could not prove, by a preponderance of the evidence, that the petitioner could relocate in Colombia out of the FARC's reach. Unlike the facts in Arboleda, however, Valencia here failed to prove past persecution. Moreover, even if we concluded that the 2001country reports in this case demonstrated that the ELN's presence and influence was country-wide, a decision we decline to reach, the record would still not compel a different result than that reached by the IJ and the BIA in this case because Valencia failed to show that he would be "singled out" for persecution on a protected ground. See Sepulveda, 401 F.3d at 1232 n.7 (affirming the IJ's denial of asylum, despite the inclusion in the 1999 and 2000 Country Reports for Colombia that guerillas exercised an influence throughout the country, because the petitioner had failed to establish that she would be singled out for persecution on account of a protected ground).

21

Lastly, to the extent Valencia argues that the requirement that an alien not have a reasonable resettlement alternative in his own country violates the United States Constitution and was improperly applied in the present case, the treaty he relies upon, as discussed above, is not self-executing and cannot give rise to a Supremacy Clause violation. Furthermore, we have held that:

> [I]t is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to pursue that option before seeking permanent resettlement in the United States, or at least to establish that such an option is unavailable. As a matter of immigration policy, a government may expect that an asylum seeker be unable to obtain protection anywhere in his own country before he seeks the protection of another country. We therefore uphold the BIA's imposition of a country-wide requirement in this case.

Mazariegos v. Office of the United States Attorney General, 241 F.3d 1320, 1327 (11th Cir. 2001). Accordingly, the "internal relocation" rule is not unconstitutional as applied, and, as discussed above, Valencia's petition was correctly denied even in the absence of the rule.

Based on the foregoing, we dismiss Valencia's petition in part for lack of subject matter jurisdiction and deny in part the remainder of his arguments that we do have jurisdiction to entertain.

**DISMISSED in part, DENIED in part.**