GREGORY, Circuit Judge,
dissenting:
While I agree that the rules of preclusion are, in this case, not applicable to the administrative courts, I believe that the Board of Immigration Appeals’ interpretation of the phrase “legal separation” in 8 U.S.C. § 1432(a)(3) violates the equal protection guarantee of the Fifth Amendment’s Due Process Clause. Therefore, I respectfully dissent.
The majority holds that a legal separation can occur only after a divorce, and, contrary to precedent, applies rational basis review to § 1432(a)(3). Section *132 1432(a)(8) is an immigration law that does not permit fathers to automatically pass on citizenship to their children born out-of-wedlock, and therefore discriminates based on legitimacy. Thus, I would instead apply heightened scrutiny, and save § 1432(a)(3) by reading it so that a separation may also occur where an alien mother has formally relinquished her rights over a child to a naturalized father. See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (“[Wjhere an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.”). The adoption of this alternative interpretation would eliminate the unconstitutional aspects of the Board of Immigration Appeals’ understanding of the law.
I.
As the majority correctly points out, Congress has plenary power in the immigration context, see Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (“[Ojver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.” (citation and internal quotations omitted)), and we are generally bound to apply only rational basis review when assessing an equal protection challenge to an immigration law, Appiah v. I.N.S., 202 F.3d 704, 709-10 (4th Cir.2000) (applying rational basis review where an alien questioned the constitutionality of an immigration law).
Nevertheless, where the petitioner, like Johnson, claims that he or she is statutorily entitled to actual citizenship, and is not merely seeking residency or a special immigration status, the Supreme Court has applied the more stringent form of “intermediate” or “heightened” scrutiny. See Nguyen v. I.N.S., 533 U.S. 53, 60-61, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) (applying heightened scrutiny); Miller v. Al-bright, 523 U.S. 420, 429-34 & n. 11, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (plurality) (same); see also Nguyen v. I.N.S., 208 F.3d 528, 533-35 (5th Cir.2000), aff'd 533 U.S. 53, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) (same).
In Miller, the daughter of a citizen father brought an action challenging the constitutionality of 8 U.S.C. § 1409(a) on equal protection grounds. 523 U.S. at 426-27, 118 S.Ct. 1428. Section 1409 required that, in order to pass citizenship onto his child born to an alien woman abroad, a citizen father had to recognize his child before she turned eighteen, but did not impose similar burdens on citizen mothers. Id. at 424-26, 118 S.Ct. 1428.
After applying heightened scrutiny to the law, a plurality of the Court held that the statute did not violate equal protection. Compare 523 U.S. at 429-41, 118 S.Ct. 1428 (plurality) with 523 U.S. at 476-78, 118 S.Ct. 1428 (Breyer, J., dissenting) (arguing that intermediate scrutiny should apply to naturalization laws that discriminate based on sex). The plurality opinion distinguished Fiallo and declined to apply it “because that case involved the claims of several aliens to a special immigration preference, whereas here petitioner claims that she is, and for years has been, an American citizen.” Miller, 523 U.S. at 428-29, 118 S.Ct. 1428; see also Nguyen, 208 F.3d at 535. In the present case, like the petitioner in Miller, Johnson also claims to have become and remained a citizen since 1973, when his father naturalized.
In Nguyen, a majority of the Supreme Court clarified Miller when it again upheld § 1409, but did so only after evaluating it *133 under the heightened scrutiny standard. 533 U.S. at 60-61, 121 S.Ct. 2053. The petitioner, a lawful permanent resident born out-of-wedlock to and raised by a citizen father in the United States, also claimed that 8 U.S.C. § 1409 violated equal protection, and that he was therefore entitled to actual citizenship. Id. at 58, 121 S.Ct. 2053. Because the law at issue was a gender-based classification, the Court applied heightened scrutiny. Id. at 60-61, 121 S.Ct. 2053. However, even after applying this standard, the Court again held that the law was valid because it was substantially related to the important governmental objectives of ensuring the existence of a biological relationship and a genuine familial bond between the citizen father and the child. Id. at 60-71, 121 S.Ct. 2053.
It does not matter that Johnson’s challenge to § 1432(a)(3) is based on a distinction drawn between the marital status of his parents, and not explicitly on sex or gender discrimination, since both forms of classification are subjected to heightened scrutiny. See Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (“[Ijntermediate scrutiny ... has been applied to discriminatory classifications based on sex or illegitimacy.”). We are further compelled to employ this higher standard because, like the statutes analyzed in Miller and Nguyen, § 1432 clearly implicates other significant constitutional interests, such as a person’s rights to citizenship, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 159, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (“Citizenship is a most precious right.”), and to maintain a familial bond, Wisconsin v. Yoder, 406 U.S. 205, 233-34, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (describing the “charter of the rights of parents” to direct the moral and religious upbringing of their children).[1]
II.
“Intermediate scrutiny queries whether a statute is substantially related to an important governmental interest.” United States v. Chester, 628 F.3d 673, 690 (4th Cir.2010) (citing Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976)). “Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government.” Chester, 628 F.3d at 683 (citing Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480-81, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)).
Section 1432(a)(1) established a general rule that allows a child to obtain citizenship automatically only after both parents have naturalized. Recognizing the need for flexibility, Congress also created several exceptions to this rule which are outlined in § 1432(a)(2) and (a)(3), and include only those scenarios where “one parent has ‘been removed from the picture’ to some degree.” Op. 126 (quoting Wedder- *134 burn v. I.N.S., 215 F.3d 795, 800 (7th Cir.2000)). Specifically, these exceptions are situations where an unmarried mother has naturalized and the father has not legitimated the child, where one parent has died, and where the custodial parent has naturalized and there has been a “legal separation.” 8 U.S.C. § 1432(a)(2) and (a)(3).
The majority reads § 1432(a)(2) so that it will only give automatic citizenship to a child when a father has retained custody of the child, divorced that child’s alien mother, and then naturalized. My colleagues may be correct that, where an alien mother has an ongoing claim to a child, the protection of the mother’s rights constitutes an important governmental interest. See Op. 125-26; see also Barthelemy v. Ashcroft, 329 F.3d 1062, 1066 (9th Cir.2003) (“If United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien’s parents rights could be effectively extinguished.”). However, they too easily dismiss the legal limbo that this leaves children like Johnson in, i.e., persons whose parents were never-married, and whose alien mother has willingly absolved herself of all parental rights. Unlike the majority, I can see no governmental interest in or reasonable basis for protecting the illusory “rights” of such parents. How can the majority’s interpretation comport with the Constitution when it clearly discriminates based on legitimacy, and does so ostensibly in order to “protect” rights that the rights-holder herself has abandoned? The answer is it cannot. Thus, it is unreasonable to seek to save § 1432(a)(3) by claiming that Congress “narrowly tailored” it so as to “avoid undue interference in the parent-child relationship” in circumstances like this one where the parent herself is not interested in maintaining such a relationship. Op. 126.
Neither the majority, nor our sister Circuits have ever squarely addressed this obvious incongruence or this exact factual scenario. See, e.g., Barthelemy, 329 F.3d at 1064 (petitioner’s mother abandoned him at birth, but had never formally relinquished her rights); Lewis v. Gonzales, 481 F.3d 125, 126-27 (2d Cir.2007) (petitioner immigrated to America with his father at age thirteen, and mother never surrendered her rights). In contrast to Barthelemy and Lewis, the issue of legal parental abandonment is squarely before us in the form of undisputed documentation stating that, within a year of Johnson’s birth, his mother ceded all of her parental rights over him to his father.
Our only solution to this dilemma is to read the statute so that it “raise[s] the rights of one parent,” Johnson’s naturalized father, “above those of the other,” the absconding alien mother. Op. 126; see also Sandoval v. Reno, 166 F.3d 225, 237 (3d Cir.1999) (construing an immigration law to “avoid serious constitutional problems”). Johnson’s father was the only parent ever to claim any legal interest in him after he was abandoned by his mother. His father then brought him to America, naturalized himself, and raised Johnson in this country. Under the alternative reading of § 1432(a)(3), Johnson would be allowed to show that he automatically became a citizen because his mother effectuated a “legal separation” when she gave up her parental rights. Because this separation did not end an official marriage, Johnson would not have to show that it was the result of a judicial proceeding as per Afeta v. Gonzales, 467 F.3d 402, 408 (4th Cir. 2006). Like the other exceptions to the general rule, this reading of § 1432(a)(3) would allow a child to be granted automatic citizenship only when one parent no longer has any legal interest in the child.[2]
*135 I am also not convinced that § 1432(a)(3) is valid simply because 8 U.S.C. § 1433 also provides a means for an unwed, naturalized father to pass citizenship on to a child. Op. at 126-27; see also Lewis, 481 F.3d at 132 (noting that § 1433 “imposes only modest requirements, none of which mandates a legal separation”). Because § 1433 does not provide for the automatic naturalization of children in Johnson’s position, the framework lauded by the majority still unconstitutionally places more onerous burdens on the illegitimate children of a naturalized parent. Specifically, it puts these burdens on the children of unmarried fathers who, unlike those of unmarried mothers, are not covered by the second clause of § 1432(a)(3), which does allow a child to gain automatic citizenship upon the mother’s naturalization. Cf. Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-640, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (recognizing that both parents have a fundamental constitutional “freedom of personal choice in matters of marriage and family life”).
Accordingly, although Johnson does not raise this issue, it is evident that § 1432(a)(3) also permits sex discrimination. By raising more hurdles to the naturalization of the children of unmarried fathers than for those of the children of unmarried mothers, the law distinguishes these children based solely on the sex of their custodial parent. See Weinberger v. Wiesenfeld, 420 U.S. 636, 652, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (“It is no less important for a child to be cared for by its sole ... parent when that parent is male rather than female.”). In Nguyen and Miller, § 1409 survived heightened scrutiny because it was based in part on actual biological differences between the sexes, and the need to create a father-child bond; whereas, here, Johnson’s father continually claimed paternity of, supported, and maintained custody over Johnson. Since I would find a legal separation only in closely analogous situations, we would never be faced with the questions of paternity at issue in Nguyen and Miller.
The government has expressed no valid basis for raising additional barriers for the children of unmarried fathers. See Mississippi University for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (“[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an exceedingly persuasive justification for the classification.” (citations and internal quotations omitted)). The law is unconstitutional because the government cannot even show that the discriminatory means employed in § 1432 for pursuing its stated pseudo-interest, i.e., protecting the rights of the absconding alien mother, is sufficiently tailored to achieve its ends. See Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980) (“[T]he discriminatory means employed must be substantially related to the achievement of [important governmental] objectives.”). Congress could have made custody or support the relevant criterion for unmarried fathers, in the same way it did for unmarried mothers, widows, widowers, and divorcees in § 1432(a). Instead, Congress appears to have relied wholly on the invidious sex stereotype that an unmarried father has less of an interest than an unmarried mother in conferring citizenship to his child. See Plyler v. Doe, 457 U.S. 202, 213, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) *136 (“The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation.”). Discriminatory laws should not be allowed to stand on such undoubtedly fragile foundations.
Indeed, given the government’s failure to come up with any sincere basis, rational or otherwise, for the distinction it draws between legitimate and illegitimate children, as well as between unmarried fathers and unmarried mothers, I have serious doubts about whether § 1432 could withstand even rational basis review. See City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (holding that, even under rational basis, a legislature “may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.”).
Finally, although the courts lack the power to confer citizenship, I.N.S v. Pangilinan, 486 U.S. 875, 884, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988); 8 U.S.C. § 1421(a), we still must interpret the laws, even immigration laws, so that they do not offend the Constitution. See Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (directing the courts generally to “ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided”); Sandoval, 166 F.3d at 237. Petitioner’s interpretation would, in light of equal protection, transform § 1432(a)(3) into constitutionally acceptable legislation, and provide for a statutorily sanctioned pathway for Johnson to obtain citizenship. That interpretation of the statute, rather than the Court itself, would then extend citizenship to Johnson. Cf. Nguyen, 533 U.S. at 71-72, 121 S.Ct. 2053 (noting “that severance is based on the assumption that Congress would have intended the result,” but declining to address this issue); but see Miller, 523 U.S. at 475, 118 S.Ct. 1428 (Breyer, J., dissenting) (arguing that once an unconstitutional clause is excised from an immigration statute, it can operate to confer citizenship).
III.
The government cannot show that the burden § 1432(a)(3) places on a naturalized parent’s ability to automatically transmit citizenship to his or her child born out-of-wedlock is substantially related to an important government interest. See Clark, 486 U.S. at 461, 108 S.Ct. 1910 (“[W]e have invalidated classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents, because ‘visiting this condemnation on the head of an infant is illogical and unjust.’ ” (quoting Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972))). By limiting the definition of “legal separation” in § 1432(a)(3) to a divorce, the majority fails to remove these unconstitutional elements from the statute. I would read § 1432(a)(3) more flexibly so that, where an alien mother has abandoned her parental rights to a father, there has also been a legal separation. I would then find that Johnson automatically became a United States citizen upon the naturalization of his father. Only this reading would allow the statute to survive the heightened scrutiny review required by the Fifth Amendment and Supreme Court precedent.
For these reasons, I must dissent.

. The cases relied on by the majority either mistakenly applied the lesser standard, Barthelemy v. Ashcroft, 329 F.3d 1062, 1065-66 (9th Cir.2003), or did not involve equal protection challenges, Lewis v. Gonzales, 481 F.3d 125, 131-32 (2d Cir.2007).
While the Seventh Circuit in Wedderburn v. I.N.S. did discuss Miller, that case was decided a year before Nguyen. 215 F.3d 795, 800-02 (7th Cir.2000). The Seventh Circuit also wrongly found that the Miller plurality applied only the rational-basis test, 215 F.3d at 801, when in fact Miller undoubtedly applied heightened scrutiny, 523 U.S. at 434 n. 11, 118 S.Ct. 1428. See also 523 U.S. at 451-52, 118 S.Ct. 1428 (O'Connor, J., concurring) (questioning the plurality opinion’s decision to apply heightened scrutiny); Nguyen, 208 F.3d at 533-36 ("A plurality opinion authored by Justice Stevens, appl[ied] the heightened scrutiny standard ....” (citing Miller, 523 U.S. at 423, 118 S.Ct. 1428)).

. Indeed, it was probably because Johnson’s father was under the impression that Johnson had gained American citizenship through his own naturalization that led him to take no additional steps to secure such citizenship for his son.